Kerry Max COOK, Appellant,

v.

The STATE of Texas, Appellee.

No. 63643.

Court of Criminal Appeals of Texas, En Banc.

Sept. 18, 1991.

Rehearing Denied Oct. 30, 1991.

Opinion Dissenting to Denial of State's Motion for Rehearing Oct. 30, 1991.

Harry R. Heard (on appeal only), Longview, Eden E. Harrington, Robert L. McGlasson, Austin, and Scott W. Howe, Springfield, Mass., for appellant.

Hunter B. Brush, former Dist. Atty., Christian Harrison, former Asst. Dist. Atty., Jack Skeen, Jr., Dist. Atty., Michael J. Sandlin and Amy R. Blalock, Asst. Dist. Attys., Tyler, and Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON REHEARING AFTER REMAND FROM THE UNITED STATES SUPREME COURT

OVERSTREET, Judge.

Kerry Max Cook, appellant, was indicted for the offense of capital murder in the death of Linda Jo Edwards alleged to have been committed on or about June 10, 1977 in Tyler, Smith County, Texas. Appellant was convicted and sentenced to death on July 13, 1978. On direct appeal to this Court we affirmed appellant's conviction. *Cook v. State,* 741 S.W.2d 928 (Tex.Cr.App. 1987). The appellant then petitioned the United States Supreme Court for a writ of certiorari, alleging primarily Fifth and Sixth Amendment violations due to the admission of psychiatric testimony of Dr. James Grigson during punishment. The Supreme Court granted appellant's petition in cause No. 87–7290, *Cook v. Texas,* 488 U.S. 807, 109 S.Ct. 39, 102 L.Ed.2d 19 (1988) and vacated our judgment and remanded the case to us for consideration in light of *Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988), which also dealt with Fifth and Sixth Amendment violations due to admission of the same Dr. Grigson's testimony at punishment. The issue became whether a

harmless error analysis applies to violations of Fifth and Sixth Amendment rights set out in *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). On remand, we again affirmed the appellant's conviction concluding that while error existed, it was harmless. On June 13, 1990, we granted appellant's motion for rehearing in order to reconsider our earlier decision. After further consideration we withdraw our previous opinion of January 17, 1990.

Appellant's case will be reconsidered once again in light of *Satterwhite*. In his motion for rehearing, appellant raises five grounds for rehearing:

1. First, the Court has misconstrued the relative reliance the prosecution placed on Dr. Grigson's testimony during summation;

2. Appellant requests that the Court reconsider whether it has misconstrued the relative importance of Dr. Grigson's testimony compared to other admissible evidence in the *Satterwhite* and this case;

3. Whether there was just as much, if not more, compelling evidence of future dangerousness, apart from Grigson's testimony, introduced in *Satterwhite;*

4. Whether the nature of the murder, i.e. more gruesome than that in *Satterwhite,* is indicative of future dangerousness; and

5. What should be the relevance of the difference in prior criminal records of John Satterwhite and Kerry Max Cook.

We will resolve these issues by addressing appellant's first two grounds for rehearing; the remaining three grounds will not be discussed separately since all lead to the ultimate inquiry, to-wit: whether we can conclude "beyond a reasonable doubt" that the erroneously admitted testimony of Dr. Grigson did not contribute to the verdict obtained.

We grant rehearing to review the erroneously admitted testimony by way of the Supreme Court's analysis in *Satterwhite*. The error in *Satterwhite* and herein are remarkably similar. In both *Satterwhite* and *Cook,* the following facts are present:

1) Dr. James Grigson, a well known and experienced psychiatrist, examines the appellants without notice to their defense counsels.

2) Dr. Grigson is permitted to testify on future dangerousness at the punishment stage over defense objections.

3) A second expert who is a psychologist by training with considerably less experience than Dr. Grigson also testifies on future dangerousness. This testimony is admissible.

4) In each trial, Dr. Grigson's testimony is clearly more resolute and explicit than that of the psychologist.

5) Dr. Grigson's testimony is alluded to in final argument by the State with emphasis on the future dangerousness issue. The testimony of the psychologist in each case is also referred to in final argument.

6) Both appellants are given the death penalty by each jury.

7) Dr. Grigson's testimony is subsequently held to be in violation of each appellant's Fifth and Sixth amendment rights.

The Supreme Court fashioned the issue in *Satterwhite* as follows: "[t]he question in this case is whether it was harmless error to introduce psychiatric testimony obtained in violation of that safeguard [Sixth Amendment][1] in a capital sentencing proceeding." *Satterwhite*, 108 S.Ct. at 1795. We are confronted again with the same issue.

### I.

A brief review of the facts is in order. The murder of Linda Jo Edwards in Tyler, Texas was a heinous crime, the details of which are outlined in *Cook v. State*, 741

---

**1.** The referenced safeguard is the Sixth Amendment right of defendants formally charged with capital crimes to consult with counsel before submitting to psychiatric examinations designed to determine their future dangerousness; the Supreme Court recognized such in *Estelle v. Smith, supra,* which was also a Texas case in which the testimony of Dr. James Grigson was at issue.

S.W.2d 928, 931–33 (Tex.Cr.App.1987). In short, the deceased had been hit in the head with a plaster object, attacked by multiple stab wounds, and the body was severely mutilated, parts of which were never found. Once appellant became a suspect, and after he was represented by counsel, he was examined by Dr. Grigson, a psychiatrist. The psychiatric examination occurred at the apparent request of the District Attorney of Smith County without notice to counsel and without court order. Appellant was moved from Smith County to Dallas County for the examination, which took place in the hospital division of the Dallas County Jail and was completed in an hour and a half. There was no showing that *Miranda* warnings were given to the appellant or that Dr. Grigson informed him that the examination was for the purpose of determining his future dangerousness. *Cook*, supra at 943. Dr. Grigson testified at the punishment phase of the trial over appellant's objection, hence the Fifth and Sixth Amendment violations as defined by the Supreme Court in *Estelle v. Smith*, supra, 451 U.S. at 469, 101 S.Ct. at 1876.

### II.

In his first point of error, the appellant contends that the reliance the prosecution placed on Dr. Grigson's testimony during summation in *Cook* was more so than that relied upon by the prosecution in *Satterwhite*. We agree with the appellant on this point.

Dr. Grigson's testimony was that Cook has an antisocial personality disorder termed sociopath and after defining it, and stating that it is not an illness but "simply a descriptive term to describe an individual which has certain personality characteristics," states that Cook is "at the very end, the very most severe where you will find of the sociopath." After responding that such a person has a complete disregard for another human being's life, Dr. Grigson stated, "[i]t's my opinion that Mr. Cook certainly will, from a medical psychiatric standpoint probability, continue to behave and act in a way that does represent a very serious threat to the people within our society." In response to whether prison society is included, the doctor testifies: "[i]t would not matter where he might be, whether he was free in the free world or whether he was institutionalized. He would present a real threat to people that found themselves in that same setting with him, whether it is prisoner guards or rather free people." In response to how severe a threat Mr. Cook would be to others, the doctor responds:

> "It is extremely severe. You can't come any more severe than that. If I had the least doubt, if I had any question within my mind, I certainly would not mind telling you that. I feel absolutely one hundred percent certain that he is and will continue to be a threat no matter where he is."

We have concluded that the prosecution did indeed refer notably to Grigson's testimony in its summation. After arguing that appellant should be executed and pointing to the psychologist's testimony that he could not be rehabilitated, the prosecutor refocused on Grigson's testimony:

> "You heard Dr. Grigson, a very professional man tell you about the categories involved in psychiatric evaluations. Didn't you hear something in every one of those categories that applied to Kerry Max Cook?

> \*     \*     \*     \*     \*     \*

> He said it is a mind who has no social responsibility in any form or fashion. Kerry Max all over again the first time. The second time you saw all over the wall of this courtroom, no social responsibility whatsoever. He has no conscience. Dr. Grigson told you that the man was impossible to rehabilitate, that he was not susceptible to rehabilitation, that he could not begin to understand what the term was."

While Dr. Grigson did not testify verbatim to the above quote "impossible to rehabilitate," this was the implication of his testimony and the prosecutor aptly attributes this testimony to Dr. Grigson in his closing argument. In *Satterwhite*, the Supreme Court writes:

His [Dr. Grigson's] testimony stands out both because of his qualifications as a medical doctor specializing in psychiatry and because of the powerful content of his message. Dr. Grigson was the only licensed physician to take the stand.

\* \* \* \* \* \*

He explained that Satterwhite has "a lack of conscience" and is "as severe a sociopath as you can be."

\* \* \* \* \* \*

Dr. Grigson concluded his testimony on direct examination with perhaps his most devastating opinion of all: he told the jury that Satterwhite was beyond the reach of psychiatric rehabilitation.

*Satterwhite*, 108 S.Ct. at 1799. After quoting a portion of the prosecutor's final argument which alludes to Dr. Grigson's testimony, the Supreme Court concluded that the error was harmful. We find it hard to conclude otherwise given the similarity of the testimony herein.

### III.

In his second ground for rehearing, appellant requests this Court to reconsider whether it has misconstrued the relative importance of Dr. Grigson's testimony compared to other admissible evidence in *Satterwhite* and the matter herein.

■ It is not the role of the appellate court to determine the harmfulness of an error simply by examining whether there exists overwhelming evidence to support the defendant's guilt. *Harris v. State*, 790 S.W.2d 568, 585, (Tex.Cr.App.1989) reh. denied 1990. The Supreme Court opines in *Satterwhite:*

> The Court of Criminal Appeals thought that the admission of Dr. Grigson's expert testimony on this critical issue was harmless because 'the properly admitted evidence was such that the minds of an average jury would have found the State's case [on future dangerousness]

sufficient ... even if Dr. Grigson's testimony had not been admitted.' [*Satterwhite v. State*] 726 S.W.2d [81], at 93. The question, however, is not whether the legally admitted evidence was sufficient to support the death sentence, which we assume it was, but rather, whether the State has proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Satterwhite,* 108 S.Ct. at 1798.

It is the State's burden to prove beyond a reasonable doubt that the jury did not consider Dr. Grigson's testimony on future dangerousness when it arrived at its finding.[2] The State asserts in its brief that we look to Dr. Landrum's testimony and the testimony of the thirteen character witnesses who all testified to future dangerousness. The position then becomes that a jury would have reached the same result based upon this evidence alone. This, however, does not answer the inquiry, "what impact did Dr. Grigson's testimony have on this same jury, if any?"

In *Satterwhite,* the State also introduced the testimony of Bexar County psychologist, Dr. Betty Lou Schroeder, on future dangerousness. When comparing the testimony of Dr. Schroeder in *Satterwhite* to that of Dr. Landrum who testified in the matter herein, the two are relatively the same insomuch as they both concluded that each appellant would be a continuing threat to society. Dr. Schroeder testified that she found Satterwhite to be a "cunning individual" and a "user of people," with an inability to feel empathy or guilt. She testified that in her opinion, Satterwhite would be a continuing threat to society through acts of criminal violence. *Id.* Dr. Schroeder's testimony was supported by recent examinations of Satterwhite wherein he had been

---

**2.** "Certainly error, constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless. It is for that reason that the original common-law harmless-error rule put

the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment." [Citation omitted] *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828.

informed of his *Miranda* rights and had also granted a release. Dr. Schroeder's testimony was properly admitted and her opinion was also referred to by the State in summation.

Dr. Landrum, a clinical psychologist, examined Cook prior to this offense, the indictment, and the appointment of counsel. Dr. Landrum's examination of Cook was not in connection with testifying on the issue of future dangerousness; this examination occurred in his capacity as a staff psychologist at Rusk State Hospital. The examination was performed within the three years prior to the June 1978 trial testimony. This testimony was properly admitted. Dr. Landrum defined Cook as sociopathic. When asked to categorize Cook, he responded, "All factors considered, I would say severe." At other points in testimony, Dr. Landrum expressed the opinion of Cook that "it is likely that he will be a continuing threat to society" and "would have a high probability of acting out in an aggressive and harmful manner." In response to whether Cook would be a continuing threat even in a prison society, Dr. Landrum responds, "Yes." In response to whether there was any doubt in his mind that Cook will constitute a continuing threat, the doctor responds, "No." And in response to whether there is even a remote possibility that Cook will be rehabilitated, the doctor replies, "In my opinion, there is not."

The prosecutor referred to Dr. Landrum's testimony in summation in the following manner: After first remarking, "[y]ou have heard a professional psychiatrist with many, many years of experience [referring to Dr. Grigson]," his next statement was as follows:

"You have heard a professional psychologist with ten years of experience in evaluating dangerous human behavior come in this Courtroom..... You heard that young psychologist on the stand when he said when you get down to the situation of a case, it's rarely, if ever, in looking at a psychopath, are you going to have any difference of professional opinion, when you narrow it down to a specific case.

"There is only one choice in this case and I thought perhaps that I misunderstood that psychologist. I said, Doctor, is there any—in your professional opinion—is there any possibility that Kerry Max Cook will be—any remote possibility. I even went so far as to say remote possibility that Kerry Max Cook will ever be rehabilitated. He said no, there is not. There is no possibility."

The prosecutor referred to Dr. Landrum as the "young psychologist" and never invokes his name in summation; whereas he makes reference to Dr. Grigson's testimony at the same time as "a psychiatrist of many, many years" and he invokes Dr. Grigson's name in summation on two occasions. Dr. Landrum was the only other expert to testify and he admitted in testimony that it may have been up to three years since he examined Cook.

The evidence admitted in *Satterwhite* revealed a history of some four convictions of violent acts ranging from aggravated assault to armed robbery including the shooting of his mother's former husband. Eight police officers testified that Satterwhite's reputation for being a peaceful and law abiding citizen was bad. *Satterwhite*, 108 S.Ct. at 1798. Review of Cook's prior history reveals no violent crimes. His one prior offense was theft of an auto. There were thirteen witnesses who testified that Cook's reputation for being a law abiding and peaceful citizen was bad.

In *Satterwhite*, Dr. Grigson told the jury that Satterwhite was beyond the reach of psychiatric rehabilitation. *Id.*, 108 S.Ct. at 1799. His testimony is not so very different here particularly in light of the prosecutor's argument to the jury which refers to Dr. Grigson when he repeats that the psychiatrist told them "the man was impossible to rehabilitate."

The Supreme Court arrived at its decision that admission of Dr. Grigson's testimony was harmful error in *Satterwhite* by stating that "Dr. Grigson was the only psychiatrist to testify on this issue (future dangerousness) and the prosecution placed significant weight on his powerful and unequivocal testimony." *Id.* The same ap-

plies to the facts herein. While the prosecution in both the *Satterwhite* and Cook trials did elicit future dangerousness testimony from both psychologists, it is clear that the emphasis placed upon the Grigson testimony herein is comparatively more eminent.

Tex.R.App.Proc., 81(b)(2), which is a Texas codification of *Chapman* provides:

"If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the errors made no contribution to the conviction or to the punishment."

It is impossible to conclude that the jury was convinced of Cook's future dangerousness required of special issue two of Article 37.071(b)(2) without the aid of Dr. Grigson's testimony. Our ultimate concern here is whether the Grigson testimony made a contribution to Cook's punishment. We cannot say, "beyond a reasonable doubt" that it did not contribute to the punishment.

Accordingly, the conviction is reversed and the cause is remanded for a new trial.

BENAVIDES, J., concurs in result.

MILLER and WHITE, JJ., dissent.

CAMPBELL, Judge, concurring.

After personally reviewing and comparing the record of Cook's trial with the record in *Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988), I concur that this case cannot be distinguished in any meaningful sense. I write, however, to emphasize (1) that the United States Supreme Court's harmless error analysis in *Satterwhite* is not consistent with the analyses in its prior cases that have never been overruled and (2) that the outcome in the instant case would be different under the analyses in those prior cases.

As we noted in *Harris v. State*, 790 S.W.2d 568, 586 (Tex.Cr.App.1989), "[t]he United States Supreme Court has been ... evasive ... when it comes to establishing any coherent standard to judge harmless [federal constitutional] error." The simple truth is that the Supreme Court has been inconsistent and has alternately embraced and rejected the "overwhelming evidence" and "cumulative evidence" tests for determining when such constitutional error is harmless beyond a reasonable doubt. *Id.* See 3 LaFave & Israel, *Criminal Procedure* § 26.6(e) (1984 & Supp.1991); Field, *Assessing the Harmlessness of Federal Constitutional Error*, 125 U.Penn.L.Rev. 15, 16 (1976);[1] 1 Weinstein & Berger, *Weinstein's Evidence* § 103[08] (1991); Comment, *Harmless Constitutional Error*, 33 Baylor L.Rev. 961 (1981).

In *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Court held that a federal constitutional error should be considered harmless if the prosecution can "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." The Court stated also that, with regard to evidentiary errors, "[a]n error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot ... be conceived of as harmless." This holding plainly created a strict standard that looked not to whether the jury could have convicted without the error, or whether the appellate court would have affirmed without the error, but to whether the error *might have influenced* the jury in reaching its verdict. In other words, under *Chapman*, a constitutional error could not be considered harmless if there was a reasonable possibility that the error, either alone or in context, moved the jury from a state of nonpersuasion to one of persuasion beyond a reasonable doubt as to the issue in question.

The decision in *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), marked the next step in the progression of the harmless error doctrine.

---

**1.** Professor Field's analysis of harmless error is perhaps the most comprehensive and persuasive presently available.

In that case, the Court, purporting to rely on *Chapman*, held harmless two erroneously admitted statements of Harrington's co-defendants that placed Harrington at the scene of the crime. The Court held the statements harmless because Harrington's own statement and other evidence properly admitted also placed him at the crime scene. It is uncertain whether the Supreme Court was attempting to establish an overwhelming evidence test or a cumulative evidence test.[2] See Field, supra, 125 U.Penn.L.Rev. at 38–39.

This approach continued in *Milton v. Wainwright*, 407 U.S. 371 [92 S.Ct. 2174, 33 L.Ed.2d 1] (1972), and *Schneble v. Florida*, 405 U.S. 427 [92 S.Ct. 1056, 31 L.Ed.2d 340] (1972). In both cases the Supreme Court again claimed that the errors were harmless, despite *Chapman*, by noting that there was overwhelming evidence of guilt. Recently, in *Delaware v. Van Arsdall*, 475 U.S. 673 [106 S.Ct. 1431, 89 L.Ed.2d 674] (1986), in extending the harmless error rule to a violation of one's Sixth Amendment right to cross-examine a witness, the Supreme Court, at least implicitly, applied an overwhelming evidence standard to the error. Similarly, in *Rose v. Clark*, 478 U.S. 570 [106 S.Ct. 3101, 92 L.Ed.2d 460] (1986), the Court cited the overwhelming evidence of guilt in determining that improper jury instructions that incorrectly shift the burden of proof to the defendant was an error subject to a harmless error analysis.

*Harris*, 790 S.W.2d at 586.

In *Satterwhite*, however, the Court, without explanation, signalled a clear break with the overwhelming evidence and cumulative evidence tests it had previously utilized and returned to the strict position

announced in *Chapman*. This shift may indicate that the Court, in applying the harmless error test, will no longer focus primarily on the reliability of the outcome of a criminal proceeding—or it may indicate that the Court has accepted the arguments made by the critics of the overwhelming evidence and cumulative evidence tests.[3] See, e.g., *Harris*, 790 S.W.2d at 600–604 (Clinton, J., dissenting); Field, supra, 125 U.Penn.L.Rev. at 32–36 & 41–47.

The *Chapman* formulation of harmless error prevailed again in *Arizona v. Fulminante*, —— U.S. ——, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). There, the Court held that the defendant's coerced confession, although cumulative of a second (lawfully admitted) confession, was not harmless beyond a reasonable doubt because, under the facts of the case, "the jury's assessment of the [lawfully admitted] confession could easily have depended in large part on the presence of the [coerced] confession." *Fulminante*, 111 S.Ct. at 1258.[4]

In short, the continued vitality of the overwhelming evidence and cumulative evidence tests is in grave doubt, although the cases utilizing those tests have never been explicitly overruled. Were either test still available, it would be appropriate for this Court to affirm Cook's conviction; that is, the untainted evidence considered by the jury at the punishment stage of Cook's trial was both "overwhelming" and "cumulative", as the Supreme Court has previously used those terms. The evidence showed, first of all, that Cook committed a crime of unspeakable horror, that his reputation for being peaceful and law-abiding was universally bad, and that he had a criminal record. That evidence, coupled with the untainted testimony of the psychologist

---

**2.** "While some writers have identified the rule adopted by the majority opinion in *Harrington* as a cumulative evidence test, a majority of the Court clearly examined the untainted evidence in the case and found it to be overwhelming." Campbell, *An Economic View of Developments in the Harmless Error and Exclusionary Rules*, 42 Baylor L.Rev. 499, 509 (1990).

**3.** "Alternatively, the *Satterwhite* decision may be more of an aberrational response to an evidentiary area of the law that the Court finds

particularly offensive—psychiatric testimony concerning future conduct." Campbell, supra, 42 Baylor L.Rev. at 524.

**4.** Chief Justice Rehnquist, joined by Justices O'Connor and Scalia, would have held the erroneously admitted confession to be "a classic case of harmless error." 111 S.Ct. at 1266. This expression obviously represents continued clinging by three justices to some form of overwhelming evidence or cumulative evidence test.

that Cook was a severe sociopath impossible to rehabilitate, would have amply satisfied either the overwhelming evidence test or the cumulative evidence test.

One can only speculate that the Supreme Court was attempting, in *Satterwhite*, to find some middle ground upon which to balance the truth-finding function of a criminal trial with the Court's responsibility to protect the integrity of the process that led to Satterwhite's conviction and sentence. With this noble pursuit, I have no disagreement. However, because of the inconsistency and uncertainty that this pursuit has left in its wake, I and other appellate judges across this country can only be confused and dismayed.

With these comments, I join in the judgment of the Court.

McCORMICK, P.J., joins this opinion.

## ON STATE'S MOTION FOR REHEARING

State's motion for rehearing denied.

MILLER, J., dissents with opinion joined by McCORMICK, P.J., and WHITE, J.

MILLER, Judge, dissenting to denial of State's Motion for Rehearing

This Court determined in *Mallory v. State*, 752 S.W.2d 566 (Tex.Crim.App.1988), that Tex.R.App.Proc. 81(b)(2)[1] was the rhetorical and semantic equivalent of the harmless error standard for constitutional errors announced by the Supreme Court in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In *Harris v. State*, 790 S.W.2d 568 (Tex.Crim.App. 1989), this Court, speaking through Judge Duncan, reviewed Supreme Court precedent and established for the first time a coherent standard by which to judge harmless error under Rule 81(b)(2). Noting the inherent subjectivity in an harmless error analysis, the Court stated that the most it "[could] do in guiding future harmless er-

ror analysis is to state a general formulation of what 81(b)(2) requires, set out general considerations which may be relevant, and trust individual judges to use these observations in their personal calculus." *Id.* at 587.

The predominant concern of the appellate court in conducting a harmless error analysis is of course the error itself. The appellate court must determine to the extent possible the impact of the error upon the trial process. *Id.* This determination necessarily requires a review of the entire record at trial, especially the other evidence presented at trial. The Court was quick to caution, however, that an error is not rendered harmless merely because there is overwhelming evidence of the guilt of the accused, but "[i]f overwhelming evidence dissipates the error's effect upon the jury's function in determining the facts so that it did not contribute to the verdict then the error is harmless." *Id.* Thus, we turn our focus to "the error" and its effect upon the jury, if any.

To focus upon the error, the appellate court should first determine the source and nature of the error committed. As noted above, the impact of the error will turn partly upon the facts of the particular case, but it will also be affected by the State's emphasis upon the error, e.g. in its jury argument. Since the appellate court is determining the impact of the error on the jury, *id.* at 587, the court must consider how much weight a juror would probably place upon the error. The court must also consider probable collateral implications of the error within the unique facts of each case. *Id.* Finally, whether declaring the error harmless would encourage the State to repeat the error with impunity must be considered by the reviewing court. *Id.* See also discussion in *Belyeu v. State*, 791 S.W.2d 66, 74 (Tex.Crim.App.1989).

The *Harris* decision then explained the proper procedure utilizing these considera-

---

1. Texas Rule of Appellate Procedure 81(b)(2) states in pertinent part:
   If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment un-

der review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment.

tions to calculate the harmfulness, or lack thereof, of the error. The Court stated:

> General consideration having been set out, we are left only to provide a skeleton on which to place them. A procedure for reaching this determination should: first, isolate the error and all its effects, using the considerations set out above and any other considerations suggested by the facts of an individual case; and second, ask whether a rational trier of fact might have reached a different result if the error and its effects had not resulted.

*Harris,* 790 S.W.2d at 588. With these principles in mind, I address the majority opinion. See *Cook v. State,* 821 S.W.2d 600 (Tex.Crim.App.1991) (Opinion on Rehearing after Remand from the United States Supreme Court).

The most glaring error in the majority opinion is its failure to conduct a harmless error analysis in light of *Harris.* Although the majority gratuitously cites to the *Harris* opinion at p. 602, thus implicitly recognizing the validity of its 81(b)(2) standard, the majority nevertheless engages in a comparative analysis of this case with *Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988). The State is correct in its brief that this Court simply relied on the superficial similarities between the facts of this case and the facts of *Satterwhite* in conducting its harmless error analysis. Such analysis ignores the principles of *Harris* which instruct the reviewing court to consider the impact of the error on the *appellant's* trial in light of the "considerations suggested by the facts of an *individual* case." *Harris,* 790 S.W.2d at 588 (emphasis added). Appellant is also denied a meaningful appeal of his individual case.

Utilizing the proper harmless error analysis under Rule 81(b)(2), as sanctioned by this Court, I conclude the error in admitting Dr. Grigson's testimony at punishment was harmless. The error in this trial stems from the use of evidence obtained in violation of appellant's Fifth and Sixth Amendment rights as set out in *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). Using this evidence, Dr. Grigson was allowed to testify and express his opinion as to appellant's probability of future dangerousness, a critical punishment issue. Art. 37.071(b)(2), V.A.C.C.P. As expected, Dr. Grigson testified that in his opinion appellant was a sociopath and represented an extremely severe threat to society. Besides Dr. Grigson's testimony, the State also presented testimony at the punishment phase from a learned psychologist, Dr. Landrum, whose testimony largely mirrored that of Dr. Grigson's.[2] Landrum testified appellant had an extensive drug abuse problem and a sexual deviation which manifested itself in violence and aggression against humans. Landrum also opined appellant would constitute a continuing threat to society, had a high probability of acting out in an aggressive and harmful manner, and was incapable of rehabilitation.[3] In its jury argument at punishment, the State referred to the testimony from both of the doctors, calling Dr. Grigson by name twice and clearly referring to Dr. Landrum as "a professional psychologist with ten years experience" and distinguishing his testimony from Dr. Grigson's by referring to him as "that young psychologist." The majority opinion attaches great significance to these references, but it is equally plausible the State made this distinction between the two for the sake of keeping its summation of the evidence easier to understand and follow. See Op. at p. 604.

Other evidence was also admitted at the punishment phase of the trial. The State presented testimony from no less than thirteen witnesses who testified to appellant's bad reputation for being a peaceable and law-abiding citizen. This testimony came not only from law enforcement personnel but also from personal acquaintances who

---

**2.** On direct appeal, this Court determined Dr. Landrum's testimony was properly admitted. *Cook v. State,* 741 S.W.2d 928, 945 (Tex.Crim. App.1987).

**3.** See the facts as set out in *Cook,* 741 S.W.2d at 945.

had known appellant for years. The State also introduced appellant's previous conviction for felony theft.

The evidence at punishment, however, is not all that a reviewing court considers in its harmless error analysis. *Harris*, 790 S.W.2d at 586. The Court must review the entire record, and in this cause, the record from guilt/innocence is particularly illuminating of appellant's propensity for violence. The facts of this offense are more than adequately summarized in this Court's opinion on direct appeal. *Cook*, 741 S.W.2d 928. This offense was committed in an extremely brutal and vicious manner. The mere facts of the offense present appellant as an abhorrent character. The jury must have wondered why this innocent victim should die such a horrifying death at the hands of a stranger. Although all murders are senseless and cruel, appellant's crime was particularly reprehensible as he cut away pieces of the victim's body, which pieces were never found. The jury did not need any specialized knowledge from an expert witness to determine appellant would be a continuing threat to society. The facts of this case alone could convince someone of that. Nevertheless, the testimony from both doctors was available for the jury's consideration in answering the special issues. Given the *entire* record in this cause, i.e. the facts of the offense, the cumulative nature of Dr. Landrum's testimony, and the remaining punishment evidence, I conclude the impact of the error in admitting Dr. Grigson's testimony was nil. Any impact at all was dissipated by the other evidence in this case. In other words, I conclude a rational trier of fact would not have reached a different result in this cause had the error not resulted. *Harris*, 790 S.W.2d at 588. The conviction in this cause should be affirmed.

In reaching this conclusion, I echo Judge Campbell's concerns in his concurring opinion that the Supreme Court's harmless error analysis in *Satterwhite*, supra, has left "inconsistency and uncertainty ... in its wake" which leads to confusion among appellate judges. See *Cook v. State*, 821 S.W.2d at 607 (Tex.Crim.App.1991) (Opinion on Rehearing after Remand from the United States Supreme Court) (Campbell, J., concurring). This Court, with its harmless error analysis in this cause, has surely only contributed to the inconsistency. The majority opinion fails to utilize this Court's harmless error analysis from *Harris*, and as a result, also reaches the wrong conclusion in this cause. Accordingly, I dissent to the denial of the State's motion for rehearing in this case.

McCORMICK, P.J., and WHITE, J., join this opinion.

