**Aaron Lee FULLER, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 71046.

Court of Criminal Appeals of Texas, En Banc.

March 25, 1992.

Rehearing Denied May 6, 1992.

Floyd D. Holder, Jr. (court appointed), Lubbock, for appellant.

Ricky B. Smith, Dist. Atty., Lamesa, Robert S. Walt, Asst. Atty. Gen. (of counsel), Robert Huttash, State's Atty., Austin, for the State.

## OPINION

BENAVIDES, Judge.

This is a direct appeal in a capital murder case. Late one evening in March of 1989 Appellant forced his way into the apartment of Loretta Stephens, an elderly Lamesa woman, stole money from her bedroom while she slept, beat her with his fists, suffocated her with a pillow, and raped her dying body. He then placed Stephens' corpse in the trunk of her own automobile, drove out of town, discarded the cadaver among some tall weeds near the highway, and later abandoned the car at a bus depot in Lubbock. For this offense, he was convicted of capital murder and sentenced to death. Appeal to this Court is automatic.

*See* Art. 37.071, § 2(h), V.A.C.C.P.; Tex. R.App.Proc. 40(b)(1).

## I.

■ In his first point of error, Appellant complains of testimony given by Dr. James Grigson at the punishment phase of his trial. Grigson, a well-known psychiatrist who often testifies as an expert for the State in capital murder prosecutions, was permitted over objection to express the view that "absolutely there is no question, no doubt, whatsoever, that [Appellant] ... will commit future acts of violence in the future, and represents a very serious threat to any society which he finds himself in." Appellant contends that such testimony violates due process of law on the basis that it is not "recognized within the field in which he [Grigson] practices" or because "Grigson simply has no demonstrable qualification for predicting dangerousness of a hypothetical individual[.]"

Appellant's argument, although it purports to attack the admissibility of Grigson's testimony in particular, actually impugns the testimony of all psychiatrists who claim a predictive aptitude unrecognized by the American Psychiatric Association and unsupported by empirical data. Insofar as this claim touches concerns of the United States Constitution, however, it was resolved contrary to his position in *Barefoot v. Estelle*, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983). This Court is not, of course, at liberty to reexamine that holding.

■ On the other hand, if taken as a challenge under state rules of evidence, Appellant's attack on the reliability of Grigson's testimony seems to implicate aspects of Rules 702 and 705(c), Texas Rules of Criminal Evidence, as well as principles usually attributed to the celebrated opinion of *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013 (D.C.Cir.1923), and long since adopted by this Court as an integral part of Texas criminal jurisprudence. And yet, Appellant is far from clear about the basis

of his complaint, and our case law is fairly specific when it comes to the expert testimony of Dr. Grigson.

Early on, this Court established a concise response to complaints about psychiatric testimony on "future dangerousness." Looking to the statutory direction that "evidence may be presented as to any matter that the court deems relevant to sentence[,]" Art. 37.071, V.A.C.C.P., we simply held that appellate complaints about the admissibility of such evidence were not well-founded because "[o]bviously the [trial] court deemed the testimony relevant[.]" *Moore v. State*, 542 S.W.2d 664, 676 (Tex. Cr.App.1976). A year later, however, we were prepared to require not only that the testimony be relevant but also that the psychiatrist giving it be qualified as an expert. *Battie v. State*, 551 S.W.2d 401, 407 (Tex.Cr.App.1977). Eventually, following these and other cases, we concluded in general that "psychiatry is ... sufficiently advanced to permit predictions of future violent behavior[,]" and that Dr. Grigson in particular is "well qualified to state his opinion regarding the probability that [an accused will] be a continuing threat to society." *Chambers v. State*, 568 S.W.2d 313, 324 (Tex.Cr.App.1978). *See also Nethery v. State*, 692 S.W.2d 686, 708–709 (Tex.Cr. App.1985).[1]

Our jurisprudence in this area has been consistently contrary to Appellant's position, and we decline to reexamine it here, principally because the issue is neither well presented by the trial record in this cause nor well joined in the appellate briefs. We of course express no view concerning the effect of evidentiary rules not argued here by the parties and not yet discussed in the case law on this subject.

Appellant's first point of error is overruled.

## II.

■ In his second point of error, Appellant maintains that evidence implying his

---

**1.** Indeed, we have even held, without dissent, that objection to Dr. Grigson's expert testimony on this issue "would amount to a futile act."

*Holland v. State*, 761 S.W.2d 307, 318–319 (Tex. Crim.App.1988).

membership in or connection with the Aryan Brotherhood should not have been received over his objection at the penalty phase of trial. He first claims, based mainly on *United States v. Lemon,* 723 F.2d 922 (D.C.Cir.1983), that he may not be penalized for the exercise of rights secured to him by the First Amendment of the United States Constitution, particularly the rights of free belief and free association. Further, he maintains that the evidence did not, in any case, prove him actually to be a member of the Aryan Brotherhood, and was therefore irrelevant to the prosecution.

We acknowledge, of course, the holding in *Lemon* that a heavier sentence may not be assessed consistently with due process "for the exercise of first amendment rights." *Id.* at 937. *See also Roberts v. United States,* 445 U.S. 552, 556, 100 S.Ct. 1358, 1362, 63 L.Ed.2d 622 (1980). Indeed, we are willing to accept for purposes of the present discussion that *Lemon* is sound as a matter of federal constitutional interpretation, even though the decisions of this Court on federal questions are not reviewable in the D.C. Circuit. We do not believe, however, that membership in the Aryan Brotherhood is protected under the standard effective in that jurisdiction.

■ Free association with other people holding similar beliefs, including beliefs which are themselves distasteful to the Constitution, is certainly among the rights assured by the First Amendment. But because organizations with illegal aims are not protected by the Constitution, neither is

membership with intent to further those aims. *Id.* at 939–940. Whether the Aryan Brotherhood is such an organization, therefore, determines the extent to which membership in it is protected by the First Amendment.

The evidence of which Appellant here complains was adduced mainly through the testimony of an investigator for the Special Prison Prosecution Unit in Huntsville, whose job apparently includes maintaining information on inmate gang activity in the Texas prison system. According to him,

[t]he Aryan Brotherhood is a white supremacy group, neo-nazi type organization, all white individuals who are basically racists. ... They are not law-abiding ... [Violence] is their main function ... Intimidation and fear ... If you are violent, you take care of business, well, then you can control people and people will fear you.

In our view, this testimony is enough to support a conclusion under the rule announced in *Lemon* that membership in the Aryan Brotherhood is not a right of free association protected by the First Amendment.[2]

■ But Appellant also objected at trial in this cause, and does so again on appeal, that testimony concerning the Aryan Brotherhood and other gang activity in Texas prisons should not have been received because the State did not show that Appellant was actually a member of any such organization or that he subscribed to any of their beliefs. The State interprets

---

**2.** After preparation of this opinion, the United States Supreme Court reversed the conviction of a Delaware man under similar circumstances because evidence of his membership in the Aryan Brotherhood, without proof of that organization's aims or practices, had been received over objection at the penalty phase of his first-degree murder trial. We regard the following statements from the Court's opinion in that case as pertinent in the present context.

[T]he Constitution does not erect a per se barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment.... Before the penalty hearing, the prosecution claimed that its expert witness would show that the Aryan Brotherhood is a

white racist prison gang that is associated with drugs and violent escape attempts at prisons, and that advocates the murder of fellow inmates. If credible and otherwise admissible evidence to that effect had been presented, we would have a much different case.

*Dawson v. Delaware,* —— U.S. ——, ——, 112 S.Ct. 1093, 1096, 117 L.Ed.2d 309 (1992). Instead, the petitioner's conviction was there reversed because, absent some proof of the group's violent and illegal activities, his membership in it was not relevant to any material issue at sentencing. Similarly, of course, proof of an organization's violent practices is not ultimately relevant to the sentencing of a specific individual without proof of that individual's membership in the organization.

this as a relevancy objection and, indeed, it has the look of a conditional relevancy complaint. But it is now clear that evidence should not be excluded merely because its relevance may depend upon the production of additional evidence at a later point in the trial or because its probative strength is alone insufficient to prove a significant fact. This is because Texas Rule of Criminal Evidence 104(b) provides that:

When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

The trial court specifically followed this rule when, confronted with appellant's relevancy objection, he stated in making his ruling, "I expect him [the prosecuting attorney], of course, to prove those things up [and] I will overrule it, pending the fact that he does prove it up." Clearly, the parties must be allowed to develop their cases one step at a time.

Still, in the instant cause, the only evidence offered to show Appellant's connection with prison gangs was the report of one James Daniel, whose inarticulate and rambling testimony is almost impossible to decipher. We reproduce here all parts of his testimony in which the State attempted to establish Appellant's affiliation with the Aryan Brotherhood. It begins when Daniels was asked whether Appellant had "ever sa[id] anything ... about being a member of any prison gangs." Daniels replied:

A As near as I can recall,—this has been quite a—quite a bit back. As near as I can recall, he—Let's see. I don't remember the exact words, or anything. I remember one time he was talking about the—some of—it was one of—I guess it was one of the groups in prison.

Q What was the name of it?

A Again, I am going to say I am not sure, because I don't remember exactly. I think it was something like Aryan, or something like that.

[Objections omitted]

Q Did he tell you anything about— himself, the defendant, did he tell you anything about the beliefs of that group?

A He—At one time, I think—if I remember correctly, he—we might have been talking along that line. There wasn't nothing really concrete.

Q Do you remember what he told you?

A Just about where the—well, let's see. Not exactly.

Q What do you recall him telling you?

A Well, from what I recall him telling me, is just, more or less, that whenever he—he had people that, you know, for his group, that he wasn't worried. You know, that he had people to take care of him there. The rest of it that I've hard [sic] about that particular organization, I've also heard it from somebody else.

Q Not what somebody else told you, but what did he tell you about it?

A Just like I said, just for him. I can't really remember exactly, you know, how it went. I'm just saying that I had head [sic] about the group before. And, possibly, while we were talking, some of the things I remembered from another guy that had talked about it, it was the same thing, the same group.

Q Did he tell you about any of the beliefs or doctrines of that group?

A I think he might have brought it up once, but I—

Q What was that?

A Okay. Before I answer that question, I'm going to say that I can't say exactly what he did say and what—and what was in my recollection from talking to the other man that was in it. Like I say, it has been a while. I don't remember exactly.

Q What was the gist of the conversation?

THE COURT: Now, I wouldn't get in on—He is trying to say that he can't remember whether it was the Defendant or someone else telling him this.

Q Mr. Daniels, do you recall what Aaron Fuller told you about it?

A  Mr. Smith [Prosecuting Attorney], I can't say exactly what he did say. Like I say, I've had prior experience with a man that was in prison, and he talked about the same thing. I can't be sure, just coming out and saying Aaron said this. I can't do that.

■ It is the State's contention, citing *Montgomery v. State,* 810 S.W.2d 372 (Tex. Cr.App.1990) (opinion on original submission), that this testimony "provides, at the very least, a "small nudge" toward proving a fact of consequence" and that Appellant was, therefore, "obligated to demonstrate below that the prejudicial impact of the evidence substantially outweighed its probative value." Brief of Appellee, p. 30. Certainly, the essential teaching of *Montgomery,* even after rehearing, is that all relevant evidence, including the marginally probative, should be admitted unless the record plainly reveals that its potential for unfair prejudice is much greater than its probative value. Accordingly, evidence not excludable on policy grounds may properly be received over a relevancy objection if it has any tendency at all, even potentially, to make a fact of consequence more or less likely than it would be without the evidence. *See* Tex.R.Crim.Evid. 104(b), 401.

But if, after all proof on the question has been received, the evidence does not in the aggregate support a rational finding that such matter of consequence is true, the factfinder should not be allowed to pass upon it. In the case of ultimate facts, this means that summary judgment or an instructed verdict should be given against the party with the burden of proof. In the case of evidentiary facts, it means that a motion to strike should be granted to withdraw the evidence from consideration. *See* Tex.R.Crim.Evid. 103(a)(1).

It is clear in the present context that James Daniels's testimony, even if relevant upon the question of Appellant's membership in the Aryan Brotherhood, was woefully insufficient to prove it. At best it suggests, and then only weakly, that Appellant once mentioned that organization in conversation, and that he might have expected it to furnish him protection while in prison.

Because this testimony was legally inadequate to connect Appellant with the Aryan Brotherhood in any meaningful way, proof in the abstract of that organization's beliefs and activities was ultimately irrelevant to any issue at the punishment phase of his trial. Without other evidence sufficient for a rational finding that Appellant was actually a member of such organization or that he subscribed to its canon of violence, the testimony in question did not increase the probability that he would be violent in the future. Accordingly, all evidence about illegal gang activity in prison was vulnerable to a motion to strike at the conclusion of the State's case, even if it was not objectionable on relevancy grounds when offered. *See Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988); 21 C. Wright & K. Graham, *Federal Practice and Procedure* § 5054, pp. 269–270 (1977); 33 S. Goode, O. Wellborn & M. Sharlot, *Texas Practice: Guide to the Texas Rules of Evidence: Civil and Criminal* § 104.2, p. 24.

■ We must, therefore, decide whether Appellant's trial objections comprised, in the aggregate, a sufficient motion to strike the evidence. Unquestionably, the basis for his objection ultimately proved meritorious. Yet, every instance in which he articulated it came well before it was clear that the State would produce no further evidence to show Appellant's membership in the Aryan Brotherhood. Thus, in spite of his clearly expressed desire to exclude the evidence, we are constrained by rules of procedure to hold that Appellant forfeited the right of appellate review by his failure to move that it be stricken after the close of the State's evidence.

■ The rule may seem harsh to some, but it is a fundamental feature of our adjudicatory system. Simply put, a trial judge cannot err in most cases by overruling a relevancy objection so long as the challenged evidence might be "connected up" before the end of trial. In the instant case the trial court's ruling was correct when made and only became challengeable when a connection by the close of the case had not been made. And it is not the judge's

duty to notice whether the evidence is eventually "connected up" in fact. Instead, the objecting party must reurge his relevancy complaint after all the proof is in, ask that the offending evidence be stricken, and request that the jury be instructed to disregard it. Otherwise, his objection will be deemed forfeited on appeal. *See Archer v. State,* 145 Tex.Crim. 584, 170 S.W.2d 733 (1943). *Cf. Boening v. State,* 422 S.W.2d 469, 473 (Tex.Crim.App.1967); *Hinton v. State,* 137 Tex.Crim. 352, 129 S.W.2d 670, 675 (1939) (opinion on rehearing). *Accord United States v. Dougherty,* 895 F.2d 399, 403, 404 (7th Cir.1990); *United States v. Gilbreath,* 445 F.2d 810, 810–811 (10th Cir. 1971) (per curiam); *Pugh v. State Farm Fire & Casualty Co.,* 474 So.2d 629, 631 (Ala.1985); *Redslob v. Redslob,* 433 N.E.2d 819, 822 (Ind.App.1982); *Dept. of Transp. v. Great Southern Enterprises, Inc.,* 137 Ga.App. 710, 225 S.E.2d 80, 84 (Ga.App. 1976); *Ault v. International Harvester Co.,* 13 Cal.3d 113, 117 Cal.Rptr. 812, 818, 528 P.2d 1148, 1154 (Cal.1974); *State ex rel. State Highway Comm. v. Heim,* 483 S.W.2d 410, 414 (Mo.App.1972); *Wilborg v. Denzell,* 359 Mass. 279, 268 N.E.2d 855, 858 (1971); *State v. Gunther & Shirley Co.,* 5 Ariz.App. 77, 423 P.2d 352, 358 (Ariz. App.1967). *See generally* Anno., *Necessity and Sufficiency of Renewal of Objection to, or Offer of, Evidence Admitted or Excluded Conditionally,* 88 A.L.R.2d 12 (1963); Edward W. Cleary, ed., *McCormick on Evidence* § 58 (3rd ed. 1984); 35 Tex. Jur.3d *Evidence* §§ 37, 38 (1984); 24 Tex. Jur.3d *Criminal Law* § 2974 (1982); Decennial Digest, *Trial,* Key Numbers 51, 90 (West).[3]

Were we to interpret Appellant's trial objection as a sufficient motion to strike in the present context, we would directly frustrate this rule. Even viewing the question in a manner favorable to Appellant's position, it seems probable from the record that the trial judge overruled each relevancy objection, not because he actually thought the evidence to be relevant at that time, but because he wanted to give the State its full opportunity to prove that Appellant was, indeed, a member of the Aryan Brotherhood. Under our rules, he cannot be faulted for doing so.

Appellant's second point of error is overruled.[4]

### III.

■ In his third point of error, Appellant complains that veniremember Jonnie White was erroneously excluded from jury service for cause on account of her objections to the death penalty. *See Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). In particular, he contends that she was improperly challenged because unwilling to consider capital punishment except for serial murderers. The State contends that her position in this regard evinces a "bias or prejudice against a[ ] phase of the law upon which the State is entitled to rely for

---

**3.** The only logical exception to this rule is where evidence, irrelevant at the time offered, will necessarily remain irrelevant regardless of any subsequent events during trial. Plainly, that is not the case here.

**4.** Judge Baird would reverse Appellant's conviction on this point because he believes the question of procedural default to have been abandoned by the State. Quoting from *Tallant v. State,* 742 S.W.2d 292, 294 (Tex.Crim.App.1987), he observes that "the State must call to the attention of the court of appeals in orderly and timely fashion that an alleged error was not preserved." He then argues that the State's failure to claim a procedural default in reply to Appellant's brief in this case disables this court from deciding the question.

There is, of course, much in the law of waiver and forfeiture that this Court has not yet addressed in a systematic way. But we did not mean to say in *Tallant* that an appellate court is prohibited from holding that points of error were procedurally defaulted at trial whenever an appellee fails to claim as much in his reply brief. Rather, on direct appeal it has been the common practice of this Court and of the intermediate appellate courts in Texas to examine matters affecting the preservation of error, whether separately argued by the parties or not. That the court of appeals in *Tallant* might have erred by failing to do so was simply not a question properly before this Court on discretionary review in that case.

conviction or punishment." Art. 35.16(b) 3., V.A.C.C.P.

Although veniremember White was never asked whether her views might substantially interfere with her ability honestly to answer the special punishment questions prescribed by law, this Court no longer requires specific inquiry on that subject as a prerequisite to the exclusion of a prospective juror for bias or prejudice against the death penalty. *See Farris v. State,* 811 S.W.2d 577 (Tex.Cr.App.1991). Cases to the contrary, particularly *Hernandez v. State,* 757 S.W.2d 744 (Tex.Cr.App. 1988) are, therefore, expressly overruled.

Our precedents teach that qualified prospective jurors must be willing to consider the full range of punishment applicable to the offense submitted for their consideration. *E.g., Pyles v. State,* 755 S.W.2d 98, 103 (Tex.Crim.App.1988); *Nethery v. State,* 692 S.W.2d 686, 691–692 (Tex. Crim.App.1985); *Barrow v. State,* 688 S.W.2d 860, 861 (Tex.Crim.App.1985). They must be able, in a sense, to conceive both of a situation in which the minimum penalty would be appropriate and of a situation in which the maximum penalty would be appropriate. The point of these cases is not that prospective jurors may be challenged for cause whenever they have strong personal feelings about the criteria to be used in assessing punishment.

But personal standards may not be allowed to supplant statutory punishment classifications. *Landry v. State,* 706 S.W.2d 105, 108 (Tex.Crim.App.1985). Those who are eligible for the death penalty under law must, therefore, also be eligible for the death penalty under standards actually applied by the jurors assessing punishment. *Cumbo v. State,* 760 S.W.2d 251, 253 (Tex.Crim.App.1988). At least for purposes of trial, this means that jurors must be willing to set their own principles aside to the extent of any conflict with requirements of the law. *Lockhart v. McCree,* 476 U.S. 162, 176, 106 S.Ct. 1758, 1766, 90 L.Ed.2d 137 (1986); *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). Otherwise, they are deemed by our precedents to be biased or

prejudiced against that law. Any prospective juror unable to consider the maximum penalty allowed by law for all legally eligible candidates is biased in just such a way and, therefore, subject to challenge for cause.

This does not mean that a person is unqualified for jury service merely because he resists imposition of severe sanctions except under special circumstances. For example, repetition of violent crime and other factors tending to prove incorrigibility, although not expressly prescribed as punishment criteria by law, are commonly urged as legitimate bases for assessing more severe punishment and are even relied upon by this Court in capital cases as grounds for holding the evidence sufficient to prove a continuing threat to society. *E.g., Crane v. State,* 786 S.W.2d 338, 355–356 (Tex.Crim.App.1990); *Baldree v. State,* 784 S.W.2d 676, 680–681 (Tex.Crim.App. 1989); *Valdez v. State,* 776 S.W.2d 162, 167 (Tex.Crim.App.1989); *Felder v. State,* 758 S.W.2d 760, 771 (Tex.Crim.App.1988). That a veniremember shares such values, or others of similar kind, cannot, therefore, lawfully be made a basis for his exclusion from jury service.

But factors other than those prescribed by law must not be made *absolute prerequisites* for imposition of any punishment, including the death penalty. *See Drew v. State,* 743 S.W.2d 207, 211 (Tex.Cr.App.1987). Because our law does not categorically reserve capital punishment only for those who have murdered before, neither may individual jurors in a capital murder case. They may, of course, hold that the absence of prior criminal history militates strongly against the death penalty. They may even find it difficult to imagine answering the second punishment issue affirmatively without convincing proof of past violence, regardless of other circumstances in the case. But they may not wholly refuse, before hearing any evidence whatsoever, to consider an accused for the death penalty unless he has been convicted of murder before.

In the instant cause, Ms. White did just that. On three different occasions during her brief examination by the parties, she averred that she could not vote to impose the ultimate sanction on a first-time offender. Although it is possible that she meant only to express reluctance, and not absolute rejection, in this matter, neither party took the time to explore her views with a precision sufficient to resolve the ambiguity. The record thus contains ample evidence from which the trial judge might rationally have inferred that Ms. White was biased against the law in a way that would substantially impair her performance as a juror. Under such circumstances, we hold that the trial judge did not err in excusing Ms. White for cause on the State's motion.

Appellant's third point of error is overruled.

## IV.

In point of error four, Appellant contends that the trial judge erred to receive in evidence a sexually explicit audio tape recording. Although the recording itself has not been included in the appellate record, we gather from the testimony that it was made by Appellant while a detainee in the Dawson County Jail, where male and female inmates are apparently kept in close enough proximity to speak with one another. Enamored of fellow prisoner Brenda Hall, Appellant evidently made a voice recording for her in which he described "what he could do to to her in bed, and what she could do to him in bed, and all that." He then played back the tape loudly, to the intense irritation of some inmates, and eventually delivered it to Ms. Hall. But another female detainee, no doubt of the irritated variety, stole the tape from Brenda and turned it over to jail authorities. From thence, it migrated to the penalty phase of this trial, where it was ostensibly offered by the State to show Appellant's lack of "remorse."

Appellant does not challenge on appeal the relevancy of this evidence, although he did so at trial. Instead, he claims only that it was objectional under Code of Criminal Procedure article 38.23(a), because "obtained ... in violation of the ... laws of the State of Texas[.]" In reply, the State does not defend legality of the seizure, but contends that Appellant has no standing to contest it. We agree.

In general, standing is a constituent requirement of justiciability, the basic posture in which a controversy must appear to be cognizable by the courts. Other features of justiciability include the rule against litigation of moot questions. 1 Tex.Jur.3d 384, Actions § 12. *See also Chacon v. State*, 745 S.W.2d 377 (Tex. Crim.App.1988). That judicial action is improper unless essential to the resolution of an actual case or controversy is currently thought, at least in the federal system, to be a matter of constitutional magnitude, arising from the separation of powers in government. *See* Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U.L.Rev. 881 (1983). *But see* Fletcher, *The Structure of Standing*, 98 Yale L.J. 221, 248–249 (1988). By this reckoning, courts lack the authority to answer abstract questions of law or to entertain litigation by persons who have not suffered actionable injury, since resolution of such matters is more appropriate to the political branches of government.

In Texas, the law of standing has been developed mainly in the courts of civil jurisdiction. There, "[i]t is a fundamental rule of law that only the person whose primary legal right has been breached may seek redress for an injury." *Nobles v. Marcus*, 533 S.W.2d 923, 927 (Tex.1976). Consequently, "[s]tanding consists of some interest peculiar to the person individually and not as a member of the general public." *Hunt v. Bass*, 664 S.W.2d 323, 324 (Tex. 1984). "For a person to maintain a court action, [therefore,] he must show that he has a justiciable interest in the subject matter in litigation, either in his own right or in a representative capacity." *Housing Authority v. State ex rel. Velasquez*, 539 S.W.2d 911, 913 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd n.r.e.). *See also Develo-cepts, Inc. v. City of Galveston*, 668

S.W.2d 790 (Tex.App.—Houston [14th Dist.] 1984). "One who has not suffered an invasion of a legal right does not have standing to bring suit." *Sherry Lane Nat. Bank v. Bank of Evergreen*, 715 S.W.2d 148, 152 (Tex.App.—Dallas 1986, writ ref'd n.r.e.).

Kindred rules have also appeared in the criminal context, usually as a result of search-and-seizure litigation. Thus, when the predecessor of article 38.23(a) was first enacted in 1925, contentions identical to those presented here were urged soon after. And, in a series of early opinions, this Court rejected them all, holding that "[t]he right to complain because of an illegal search and seizure is a privilege personal to the wronged or injured party, and is not available to anyone else." *Craft v. State*, 107 Tex.Crim.R. 130, 295 S.W. 617 (1927), quoting *Cornelius on Search and Seizure*, § 12, p. 62; *Allman v. State*, 107 Tex. Crim.R. 439, 296 S.W. 580 (1927); *Jenkins v. State*, 108 Tex.Crim.R. 184, 299 S.W. 642 (1927). Our position in this respect has remained generally unchanged over the years. *See e.g., Phariss v. State*, 137 Tex. Crim.R. 469, 131 S.W.2d 965 (1939) (opinion on rehearing); *Paige v. State*, 161 Tex. Crim.R. 571, 279 S.W.2d 344 (1955); *Rubens v. State*, 166 Tex.Crim.R. 71, 311 S.W.2d 242 (1958); *Holcomb v. State*, 172 Tex.Crim.R. 392, 356 S.W.2d 932 (1962); *Schepps v. State*, 432 S.W.2d 926, 932 (Tex. Crim.App.1968) (opinion on original submission); *Willeford v. State*, 454 S.W.2d 745 (Tex.Crim.App.1970); *Kay v. State*, 489 S.W.2d 861 (Tex.Crim.App.1973); *Janecka v. State*, 739 S.W.2d 813, 830 (Tex.Crim. App.1987).

■ As in the past, we do not interpret the sweeping language of article 38.23(a) to confer automatic third party standing upon all persons accused of crimes, such that they may complain about the receipt of evidence which was obtained by violation of the rights of others, no matter how remote in interest from themselves. Although article 38.23 might be read in such a way, we are simply unwilling, by statutory interpretation, to work such a fundamental change in this State's elemental law of standing without a rather more explicit indication of legislative intent.

The justiciable injury suffered as a direct and immediate result of the illegality of which Appellant here complains was not his own. The illegality, if any, was theft or conversion. The victim, if any, was Brenda Hall. Brenda Hall may have a cognizable cause of action for conversion against someone. The State of Texas may have a basis to prosecute someone for the criminal offense committed against Brenda Hall. But no one may sue, nor may the State of Texas prosecute, anyone for an injury to the Appellant arising from the illegality about which he now complains, since he suffered no injury actionable under our law as a result of it. No actionable wrong was visited upon Appellant as a result of the seizure. For this reason we hold that he is also without standing to challenge such illegality in the context of a criminal prosecution, and we reaffirm our early cases to such effect.

Appellant's fourth point of error is overruled.

### V.

■ In point of error five, Appellant maintains that inculpatory statements given by him while in police custody were tainted by the illegality of his arrest and should, therefore, have been suppressed by the trial judge. In all, it seems he made five separate declarations to the police, culminating finally in a videotaped version, the only one actually offered in evidence at his trial. Relevant events leading to the making of this recording were developed at a suppression hearing held outside the jury's presence.

The investigation into the disappearance of Loretta Stephens produced no significant leads until the police received a "crime line" tip that her car could be found in Lubbock, her body somewhere on the road from Lamesa to Lubbock, and that Appellant "knew something about her disappearance." Acting on this information, investigators first located the car and then went looking for Appellant.

They found him several days later at the house of a friend. But, instead of placing him in custody, the officers simply informed him that they were conducting a criminal investigation and would like to speak with him at the station. Appellant, although nervous at first because one of the officers informed him of his right to remain silent and to have a lawyer present during questioning, nevertheless agreed to accompany them to the Sheriff's Office because he was told that they did not intend to arrest him at that time.

Upon arrival at the station, however, Appellant was notified that the officers suspected him of involvement in the disappearance of Loretta Stephens. He denied the accusation and offered to account for his whereabouts during times relevant to the investigation. After being read his rights again, he was then left in a separate room to write a statement in his own hand.

In the mean time, investigators managed to locate a person who claimed to have ridden with Appellant in the deceased's car several days earlier and to have witnessed him jettison a human body beside the road on their way to Lubbock. Consequently, when Appellant emerged from the room with an entirely exculpatory statement of his activities during the times in question, one of the officers accused him of lying and revealed that his friend had implicated him in an apparent murder.

At this point, Appellant was moved to tears and asked for the opportunity to write another, revised statement. He was returned to the private room from which he had just come, warned again of his constitutional rights, and left to compose another account of his activities on the night in question. While he was so occupied, the search for Loretta Stephens' body continued, and eventually succeeded with the help of Appellant's former travelling companion, turned accuser. A warrant was then issued for Appellant's arrest, and he was promptly taken before a magistrate for arraignment. *See* Art. 15.17, V.A.C.C.P. After that he was not permitted to leave official custody, and was detained in the Dawson County Jail to await indictment and trial for capital murder.

Meanwhile, he had produced two more statements in his own handwriting. In both versions he admitted to burglarizing, robbing, raping, and killing the deceased. Then, about a week later, his parole officer paid him a visit. As he was brought from his cell to an interview room, Appellant announced that he wanted to make yet another statement concerning his murder of Loretta Stephens. So, after his parole officer left, Appellant was brought down to an interrogation room and, as in the past, left alone to write out his own narrative. It then occurred to one of the deputies that the statement might be more effective if read aloud by Appellant on videotape. When the suggestion was made, Appellant readily agreed, and an audio-video recording was then taken of his final confession. It is the admissibility of this last statement, recorded on videotape, which he now challenges on appeal.

The trial judge found Appellant's videotaped confession to have been made "freely and voluntarily[,]" but made no findings concerning the legality of his arrest or the extent to which any of his inculpatory statements might have been obtained by exploitation of illegal police conduct, even though the law is clear that voluntariness of a confession does not alone render admissible an inculpatory statement obtained by means of a Fourth Amendment violation. *Taylor v. Alabama*, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Because Appellant's trial objection was sufficient to apprise the judge of his Fourth Amendment complaint, we assume in the absence of specific findings that such complaint was also resolved adversely to him when the judge ultimately concluded that the challenged evidence should be admitted.

The initial premise of Appellant's tainted-evidence claim is that he was under arrest in fact at the time he first accompanied law enforcement officers to the station, and

that his arrest was unlawful because the officers lacked both an arrest warrant and probable cause at that time to believe he had committed an offense. Surprisingly, the State has opted not to join issue on this question. *See, e.g., Melton v. State,* 790 S.W.2d 322, 323–325 (Tex.Crim.App.1990); *Dancy v. State,* 728 S.W.2d 772, 778 (Tex. Crim.App.1987); *Shiflet v. State,* 732 S.W.2d 622 (Tex.Crim.App.1985). Accordingly, although not plainly obliged to do so, we are willing to assume for purposes of analysis that there was something constitutionally illicit about the way deputies lured Appellant to the Sheriff's Office. The issue on appeal thus devolves into whether Appellant's videotaped confession was "come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), *quoting* Maguire, *Evidence of Guilt* 221 (1959). *See also, Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939).

Our own decisional law, both implementing the federal constitution and construing cognate requirements of Texas constitutional and statutory law, counsels a searching review of the record for evidence revealing whether the taint of illegality was dissipated before the challenged evidence was obtained. *Comer v. State,* 776 S.W.2d 191, 196–197 (Tex.Crim.App.1989); *Bell v. State,* 724 S.W.2d 780, 787–788 (Tex.Crim. App.1986); *Sweeten v. State,* 667 S.W.2d 779, 781–782 (Tex.Crim.App.1984). *But see Beasley v. State,* 728 S.W.2d 353, 358–359 (Tex.Crim.App.1987) (McCormick, J., dissenting). Conforming to Supreme Court suggestion, we customarily examine such evidence for its relevance to four factors: "(1) whether or not the accused received *Miranda* warnings; (2) the temporal proximity of the arrest and confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct." *Maixner v. State,* 753 S.W.2d 151, 155 (Tex.Crim.App.1988). *See also Foster v. State,* 677 S.W.2d 507, 510 (Tex.Crim.App.1984); *Gregg v. State,* 667 S.W.2d 125, 128 (Tex.Crim.App.1984).

Having done so in the instant cause, we can find no fault with an implied conclusion of the trial judge that the evidence, measured by these criteria, militates in favor of admissibility. Indeed, we think it does so rather strongly. It is undisputed, for example, that Appellant received both verbal and written warning of his right to remain silent at least once for every inculpatory statement made by him. Moreover, the only statement admitted against him at trial was taken at his own suggestion nearly a week after his allegedly illegal arrest. And, although it is not apparent that there were intervening circumstances of any special importance during this interval, there is also nothing to suggest that the police engaged in any specifically coercive practices to elicit Appellant's statements. Thus, if their conduct was unlawful at all, its evident purpose at least was to follow a significant investigative lead, not to circumvent constitutional law, and it appears that they did so in a reasonably professional manner, without flagrantly abusing their official authority. On a record of this kind, we simply cannot say that the trial judge erred as a matter of law to receive the evidence. *See Little v. State,* 758 S.W.2d 551, 565–567 (Tex.Crim.App.1988); *Self v. State,* 709 S.W.2d 662, 664–665 (Tex.Crim. App.1986).

In the final analysis, Appellant's only real argument for exclusion of the videotape is that he could not realistically have been expected to resist efforts by the police to obtain more confessions from him after they had already exploited his illegal arrest to procure the first one. This "cat-out-of-the-bag" argument, in spite of its superficial plausibility, was recently rejected by the Court under circumstances of somewhat greater merit than Appellant can boast here. *Griffin v. State,* 765 S.W.2d 422, 430–431 (Tex.Crim.App.1989). In any event, we think there is a considerable difference between succumbing to later demands for additional information and volunteering that information without any inducement whatsoever. As a factual matter, at least, Appellant's posture in this case is ill-suited to the argument that his

ultimate confession was somehow precipitated by the fact of his earlier statements. *Cf. Gentry v. State,* 770 S.W.2d 780, 788–790 (Tex.Crim.App.1988); *Wicker v. State,* 667 S.W.2d 137, 140–142 (Tex.Crim.App. 1984). We therefore remain convinced that a rational trial judge would not necessarily err to find the taint, if any, of such earlier statements well dissipated under these conditions.

Appellant's fifth point of error is overruled.

## VI.

█ In point of error six, Appellant contends that his videotaped confession was also inadmissible because he had not made an effective waiver of his Sixth Amendment right to counsel before giving it. We disagree.

█ The Sixth Amendment right to counsel automatically becomes effective at the inception of adversary judicial criminal proceedings and must be implemented by the State at every critical stage of those proceedings, even absent a specific request, unless the accused intelligently and voluntarily yields his prerogative to the assistance of an attorney. *See Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Carnley v. Cochran,* 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962). Whether adversary proceedings have begun for purposes of this rule is not entirely a constitutional question, but largely a matter of local law. *See Moore v. Illinois,* 434 U.S. 220, 228, 98 S.Ct. 458, 464, 54 L.Ed.2d 424 (1977). In Texas, a criminal prosecution is variously considered to be in progress after the accused has been formally arrested and taken before a magistrate, or when he has been indicted or charged by complaint and information with a criminal offense. *See DeBlanc v. State,* 799 S.W.2d 701, 706 (Tex.Crim.App.1990); *Lucas v. State,* 791 S.W.2d 35, 44–45 (Tex. Crim.App.1989); *McCambridge v. State,* 778 S.W.2d 70, 75–76 (Tex.Crim.App.1989); *Janecka v. State,* 739 S.W.2d 813, 826 (Tex. Crim.App.1987); *Nehman v. State,* 721 S.W.2d 319, 322 (Tex.Crim.App.1986); *Barnhill v. State,* 657 S.W.2d 131, 132 (Tex.Crim.App.1983).

Because it is clear from the record in this case that Appellant was both placed under arrest and charged with an offense before making his videotaped confession, he is probably right to insist that an effective waiver of counsel under the Sixth Amendment was essential to the admissibility of his ensuing statements. But, given the conditions under which those statements were made, it is evident he knew in fact that he could remain silent or request the assistance of an attorney at any time. And there is no evidence suggesting that his decision to volunteer another statement was coerced. *Cf. Moran v. Burbine,* 475 U.S. 412, 422–423, 106 S.Ct. 1135, 1141–1142, 89 L.Ed.2d 410 (1986). Accordingly, we do not doubt that his apparent desire to forego counsel was, indeed, tantamount to "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

Moreover, it is undisputed that he, not the police, initiated the conversation which led eventually to his videotaped confession and that he did not subsequently ask to consult with a lawyer. *Cf. Michigan v. Jackson,* 475 U.S. 625, 636, 106 S.Ct. 1404, 1411, 89 L.Ed.2d 631 (1986); *Holloway v. State,* 780 S.W.2d 787, 795–796 (Tex.Crim. App.1989). Under these circumstances, because the evidence suffices for a conclusion that he was warned repeatedly in the manner decreed by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that he expressly affirmed a desire to waive the protections described by those warnings, including the right to have counsel present during any questioning, there is an adequate basis in the record for a conclusion that his waiver was constitutionally acceptable, not only under the Fifth Amendment, but for Sixth Amendment purposes as well. *Patterson v. Illinois,* 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988). We therefore perceive no transgression of the kind alleged by him in the manner by which the State secured his videotaped confession.

Appellant's sixth point of error is overruled.

## VII.

In point of error seven, Appellant complains that the trial judge erred to receive in evidence over his objection three color photographs of the deceased which, he claims, impassioned the jury without furnishing anything of significant probative value. Each of these photographs depicts the murder victim after her discovery and transfer to the morgue. From our examination of the monochromatic copies included in this appellate record, it seems to us that the pictures in question primarily show injuries to the victim's head and face, which were the alleged cause of her death. One photo, however, also includes an unfocussed view of her naked torso, which Appellant asserts was especially inflammatory.

Under our rules, trial judges are authorized to exclude even relevant evidence when, among other reasons, "its probative value is substantially outweighed by the danger of unfair prejudice[.]" Tex.R.Crim. Evid. 403. Recent case law makes this authorization a requirement. *Montgomery v. State*, 810 S.W.2d 372, 392 (Tex.Crim. App.1990) (opinion on rehearing). Accordingly, when the opponent of evidence satisfactorily demonstrates that its probative value is far less than the danger of unfair prejudice it poses, and he objects to its receipt on this basis, the trial judge must not admit it. *Id.* In making the determination the trial judge should consider the inherent tendency that some evidence may have to encourage resolution of material issues on an inappropriate basis and should balance carefully against it the host of factors affecting probativeness, including relative weight of the evidence and the degree to which its proponent might be disadvantaged without it. *Id.* at 389–390. We have recently held that these rules supplant former case law for purposes of admitting allegedly inflammatory photographs. *Long v. State*, 823 S.W.2d 259, 269–273 (Tex.Crim.App.1991).

In the instant cause, it seems clear enough that the disputed photographs do have a "tendency to make the existence of a[ ] fact that is of consequence to the determination of the action more probable ... than it would be without the evidence." Tex.R.Crim.Evid. 401. Certainly, the State was required to prove not only that a death occurred, but also that it was accomplished in the manner alleged, by a beating of the victim's face and head. Because the photographs in question clearly helped to supply such proof, they were undoubtedly relevant to the prosecution.

On the other hand, it is equally sure that the State's case would not have been rendered significantly less persuasive by exclusion of the pictures. Ample testimony was adduced to establish the cause of death and to describe the effect produced upon the deceased's body by the terrible beating she suffered. Indeed, these matters were not disputed at all, and it seems more than a little unlikely that jurors would have harbored doubts about the cause of death absent the pictures in question. In context of the trial as a whole, therefore, the probative value of this evidence was not great. *See Morgan v. State*, 692 S.W.2d 877 (Tex.Crim.App.1985).

But we are not persuaded that receipt of the pictures likely influenced the jurors in this cause to decide essential issues on an impermissible basis. The photographs of which Appellant here complains are not, in our estimation, so horrifying or appalling that a juror of normal sensitivity would necessarily encounter difficulty rationally deciding the critical issues of this case after viewing them. *See James v. State*, 772 S.W.2d 84, 98–99 (Tex.Cr.App.1989), *vacated on other grounds* 493 U.S. 885, 110 S.Ct. 225, 107 L.Ed.2d 178 (1989); *Purtell v. State*, 761 S.W.2d 360, 370–371 (Tex. Crim.App.1988); *Jackson v. State*, 745 S.W.2d 4, 18 (Tex.Crim.App.1988). We believe this to be so not only with respect to the physical injuries represented, but also as regards the incidental nudity depicted in one of the photographs. Although the latter does leave an impression that the deceased is naked above her waist, it does not otherwise seem so grossly indecent or vul-

gar as to divert attention from the injuries which are clearly its principal focus. Accordingly, we hold that the questioned photographs do not present a potential for unfair prejudice which clearly outweighs as a matter of law their probative value. The trial judge did not err to receive them in evidence.

Appellant's seventh point of error is overruled.

## VIII.

■ While confined in jail awaiting trial, Appellant had a number of conversations with a cohort which were overheard by other inmates and, in at least one case, by a jailer. In these conversations, Appellant occasionally spoke in such a manner as to imply that he did not commit the murder of Loretta Stephens by himself but that he had agreed to accept the entire responsibility for it anyway. A written report to this effect was prepared by a deputy sheriff who had overheard parts of one such conversation herself and to whom additional parts had been related by other detainees. When Appellant sought to elicit testimony from the deputy concerning contents of this report, the State interposed a hearsay objection, which was sustained.

In his eighth point of error, Appellant seems to maintain that the report was admissible as an exception to hearsay under Texas Rules of Criminal Evidence, 803(8)(B) and 803(8)(C). But he offers no explanation why the written statement of a deputy sheriff, who is undoubtedly a law enforcement officer, ought to be received under a rule which expressly excludes "matters observed by police officers and other law enforcement personnel[.]" Rule 803(8)(B). Similarly, he suggests no tenable interpretation of the rules which could easily accommodate the unembellished report of an eavesdropper to the status of a "factual finding[ ] resulting from an investigation made pursuant to authority granted by law[.]" Rule 803(8)(C). *See generally* 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence: Commentary on Rules of Evidence for United States Courts and State Courts*

¶¶ 803(8)[03]–803(8)[05] (1991); 2 Gregory P. Joseph & Stephen A. Saltzburg, *Evidence in America: The Federal Rules in the States* § 58.3, pp. 52–56 (1987).

Evidently, the real gist of Appellant's eighth point is that the United States Constitution requires admission of the deputy's report for the truth of the matters asserted therein, even though the Rules make it objectionable, because it was essential to the plausibility of his defensive theory. Certainly, one charged with a crime has the right to defend himself. The constitutional assurance of compulsory process to obtain favorable witnesses, contained in the Sixth Amendment and applicable to the states through the Fourteenth, is a key source and firm guarantor of that right. *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). So is the Fourteenth Amendment itself, which prohibits the State from depriving an accused of his life or liberty without due process of law.

Extrapolated from these basic tenets, an intellectually honest, albeit theoretically unstable, argument can be made for the proposition that the United States Constitution trumps local rules of evidence whenever it would be "fundamentally unfair" to apply them. For example, we know that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). *See also Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979). Appellant claims that the rules at work in this case, when construed to exclude his evidence, do precisely that.

The worst problem with a contention of this kind is that it is difficult to evaluate. Every rule of evidence works a hardship on some litigants part of the time, and it is easy to sympathize with the frustration of any party whose most promising strategy turns out to be objectionable under the law. But we are not at liberty to relieve every such disappointment with an *ad hoc* suspension of the Rules. *Cf. Taylor v. Illinois*, 484 U.S. 400, 108 S.Ct. 646, 98

L.Ed.2d 798 (1988). Our impression of the sparse case law in this area of constitutional interpretation is that rules for the admission and exclusion of evidence should be found offensive to notions of fundamental fairness embodied in the United States Constitution only when, (1) without a rational basis, they disadvantage the defendant more severely than they do the State or (2) arbitrarily exclude reliable defensive evidence without achieving a superior social benefit. *See Rock v. Arkansas*, 483 U.S. 44, 53–56, 107 S.Ct. 2704, 2710–2711, 97 L.Ed.2d 37 (1987).

We find neither such inhibition to enforcement of the hearsay rule against Appellant in the present context. In the first place, Rule 803(8)(B) requires on its face a thoroughly even-handed application, while Rule 803(8)(C) specifically benefits only the defendant. Accordingly, there is no potential disadvantage in the rule specific to an accused person because it is reasonably clear that the evidence would be as objectionable if offered by the State.

Secondly, because it lacks any distinguishing mark of reliability, the report Appellant sought to introduce in this case is precisely the sort of thing which the hearsay rule, in spite of its many exceptions, is still specifically designed to exclude. It is manifest from a reading of the entire record that Appellant actually elicited virtually the same evidence by direct examination of the inmate from whom the deputy sheriff obtained her information in the first place. In an ironic twist, Appellant nevertheless argues that the written report was more desirable to him than such testimony because the inmate witness then gave further evidence detrimental to him on cross examination. Evidently, he believes that the United States Constitution somehow prefers a written report to the live testimony of a witness whenever it might enable an accused to curtail the State's opportunity for effective cross examination.

This proposition is, of course, untenable. It is inconceivable that the United States Constitution would sanction the suppression of relevant inculpatory evidence under the aegis of a doctrine whose very purpose is the removal of unreasonable obstacles to the truth-finding process. Because the ruling of the trial court about which Appellant complains did not actually deny him the proof he wanted, and because he is not entitled to deny the State an opportunity for rebuttal, we are satisfied that his rights to compulsory process and due process of law were not abridged in the manner he contends.

Appellant's eighth point of error is overruled.

## IX.

In point of error nine, Appellant urges us to declare the Texas death penalty statute unconstitutional because it gives trial judges unbridled discretion to determine what is relevant at the penalty phase of trial. *See* Art. 37.071, § 2(a), V.A.C.C.P.

Similar contentions were long ago resolved contrary to the position Appellant takes here. *O'Bryan v. State*, 591 S.W.2d 464, 474–475 (Tex.Crim.App.1979); *Brown v. State*, 554 S.W.2d 677, 678 (Tex.Crim. App.1977). He reurges it in the present context because he blames this Court's expansive understanding of "relevancy" in death penalty cases for the admission of testimony from four jail inmates, Appellant's ex-wife, and one of her girlfriends, all of which, in Appellant's opinion, was irrelevant because it had nothing "to do with prior acts of violence or any propensity for violence." *See, e.g., Allridge v. State*, 762 S.W.2d 146, 161–162 (Tex.Crim. App.1988); *Sanne v. State*, 609 S.W.2d 762, 773 (Tex.Crim.App.1980); *McManus v. State*, 591 S.W.2d 505, 526–527 (Tex.Crim. App.1979); *Robinson v. State*, 548 S.W.2d 63, 65 (Tex.Crim.App.1977). *See generally Beltran v. State*, 728 S.W.2d 382, 386–387 (Tex.Crim.App.1987).

Our review of the record discloses that the testimony of these six witnesses was mostly to the effect that Appellant habitually beat, choked, and burned his ex-wife, that he threatened to kill her and other unidentified persons if released from jail, and that he would rather take his own life than spend it in prison. The witnesses also testified to Appellant's planned jailbreak,

his attempts to smuggle drugs into the jail, and his generally licentious conduct.

Our precedents do tend to support the admissibility of testimony like this, especially since we have not considered evidence of past violence to be the only acceptable evidence that future violence is probable. *E.g., Smith v. State*, 676 S.W.2d 379, 392 (Tex.Crim.App.1984); *Cass v. State*, 676 S.W.2d 589, 593 (Tex.Crim.App.1984). Rather, we have thought, and continue to think, that evidence of other conduct, even if not violent in itself, may have some tendency to reveal a character prone to violence. To the extent that it does, it is undoubtedly relevant to the second special punishment issue, even under a more restrictive understanding of "relevancy" than is typically employed by trial judges at the penalty phase of capital murder cases. We, therefore, think it eminently reasonable to suppose that all of appellant's behavior described in the testimony of which he complains does, indeed, indicate a "propensity for violence."

Furthermore, the probability of future violent conduct, although not a matter affecting personal moral culpability, has been held by the Supreme Court to be a permissible consideration in the decision whether to impose death as a punishment for past conduct. *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). In the last analysis, therefore, Appellant's complaint is unavailing because the evidence about which he complains was actually relevant under this Court's precedents upon an issue which both the Texas Legislature and the United States Supreme Court have held material to the decision whether to impose capital punishment. Accordingly, its receipt in evidence does not present error at all, let alone fundamental constitutional error which we must notice even absent a trial objection.

Appellant's ninth point of error is overruled.

## X.

■ In his tenth point of error, Appellant challenges the constitutionality of the Texas capital sentencing scheme as applied in his case because, he contends, the jury was not empowered to express a reasoned moral response to his mitigating evidence. Appellant points to testimony of his mother and grandfather that he was physically abused by his stepfather while still a young child, and maintains that he was, therefore, entitled to a jury instruction of the kind requested in *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

We need not decide whether the evidence proffered by Appellant in mitigation was actually relevant to his personal moral culpability in a way not fully contemplated by the statutory punishment questions, nor whether his evidence had mitigating value of some other kind. The jurors here were expressly authorized by the court's charge to answer one or more such questions in the negative if they thought the evidence had sufficient mitigating value of any kind.[5] We hold that such charge was adequate to avoid the constitutional infirmity condemned by *Penry* because we do not perceive "a reasonable likelihood that the jury … applied the challenged instruction in a way that prevent[ed] the consideration of constitutionally relevant evidence." *Boyd v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

Appellant's tenth point of error is overruled.

---

5. The entire instruction to this effect read as follows:

When you deliberate about the questions posed in the Special Issues, you are to consider any mitigating circumstances supported by the evidence presented in both phases of the trial. A mitigating circumstance may be any aspect of the defendant's character and record or circumstances of the crime which you believe makes a sentence of death inappropriate in this case. If you find there are any mitigating circumstances, you must decide how much weight they deserve and give them effect when you answer the Special Issues. If you determine, in consideration of this evidence, that a life sentence, rather than a death sentence, is an appropriate response to the personal moral culpability of the defendant, you are instructed to answer at least one of the Special Issues under consideration "No."

## XI.

Finally, Appellant urges us to find the evidence insufficient to support an affirmative answer to the second statutory punishment issue. This issue requires a finding not only that the accused will likely commit violent crimes in the future but also that his violent conduct will pose a continuing threat to society. Art. 37.071 § 2(b)(1), V.A.C.C.P.

The Texas common law of evidentiary sufficiency is perhaps more exhaustive in this area than in any other, and our liberty to find a case unconvincing on appeal is powerfully constrained by the force of precedent, both as a matter of law and as a matter of practice. *See Keeton v. State,* 724 S.W.2d 58 (Tex.Crim.App.1987). To date, we have confronted so many claims of insufficient evidence on the discrete issue of "future dangerousness" that it is difficult now for us to envisage a case with historical facts novel enough to justify a fresh approach. The instant offense is no exception.

Following an impressive history of unadjudicated larcenies as a juvenile, Appellant was finally convicted of felony theft in 1985 and placed on adult probation. But before long he was at it again, and the trial judge decided to give him a taste of prison life. After revoking his probation, the court sentenced him to confinement in the penitentiary for a period of five years, but ordered him returned for further court supervision a few months later, hoping for better success the second time around. Once back in town, however, Appellant resumed his habit of unlawful entry and theft, culminating eventually in another revocation of his probation and a second felony conviction for burglary. In 1986 he was sent to the penitentiary to serve sentences of two years and fifteen years respectively. While there, he acquired an extensive disciplinary record for fighting, refusing to work, and possessing contraband. Eventually paroled in 1988, Appellant returned home three years after his first felony conviction. Still only 20 years old, he had served a total of just six months in prison.

The instant offense was committed less than a year later. Although Appellant entered the deceased's home to steal from her while she slept, he accomplished that objective without arousing any suspicion. He might then simply have left the premises with no one the wiser. No sense of fear, discovery, or anger occasioned his decision to kill. Instead, he was simply overcome by a sudden, inscrutable impulse to take a human life.

It is difficult not to think such a person dangerous, and equally difficult not to fear him for the foreseeable future unless the cause of his dysfunction can be discovered and corrected. Yet, the only psychiatric testimony offered in this case holds that Appellant's dangerously criminal misconduct is likely to be repeated indefinitely, a hypothesis which is substantially corroborated by his past criminal and antisocial behavior, including brutal physical assaults on his ex-wife, excessive use of drugs and alcohol, and threats of violence against others. Clearly, by any reckoning, he has thus far proven incorrigible.

On these facts, the jurors thought it probable that Appellant would continue to threaten society if not put to death. Given the particular circumstances of this case, and in light of our precedents, we cannot say that their conclusion was without sufficient evidentiary support. *E.g., Havard v. State,* 800 S.W.2d 195, 212–213 (Tex.Crim. App.1989) (opinion on original submission); *Bower v. State,* 769 S.W.2d 887, 895 (Tex. Crim.App.1989); *James v. State,* 772 S.W.2d 84, 88–91 (Tex.Crim.App.1989); *Burdine v. State,* 719 S.W.2d 309, 315–316 (Tex.Crim.App.1986).

Appellant's final point of error is overruled.

Finding no reversible error in the points assigned for review on appeal, we affirm the judgment of conviction and sentence of death.

CLINTON, Judge, dissents with note:

Dissents generally and particularly to disposition of point four for the reason that under the "plain language rule" an accused is entitled to complain that evidence ob-

tained illegally "shall (not) be admitted in evidence against (him)." Article 38.23(a), V.A.C.C.P.

MILLER, Judge, concurring.

As to Roman numeral II and the treatment of preservation of error, Tex.R.Crim. Evid.Rule 103(a)(1) demands a *timely* "objection" or "motion to strike". Rule 104(b) allows admission of evidence "subject to" proving up relevancy later in the trial. The question of when such a Rule 103(a)(1) objection or motion to strike is "timely" depends directly on the answer to the question of just who has the obligation to point out that the "proving up" part of Rule 104(b) never occurred. The plurality opinion would put that burden on the party opponent to the admission of the evidence; I disagree.

For various policy reasons I would put the burden, of pointing out that the "proving up" requirement has not been met, upon the judge who availed himself of the procedures in Rule 104(b). Since a majority of this Court cannot agree whether the judge or the party opponent has that burden, further elaboration today of the policy reasons would seem to be an exercise in futility, and is better left to another day when perhaps a consensus might emerge.

With these remarks I only concur in the result reached in section II of the plurality opinion, but join the remainder of that opinion.

MALONEY, J., joins this concurring opinion.

OVERSTREET, Judge, concurring.

I concur in the result only because I believe the majority opinion incorrectly concludes that appellant's second point of error, which complained of admission of testimony implying his membership in an Aryan prison gang, was not preserved for appellate review. The majority concludes that he waived this error when he failed to renew his objection and request an instruc-

tion to disregard the testimony at the end of the State's presentation. Since appellant had lodged a timely objection initially, in my opinion the error was sufficiently preserved.

When the Court finds error has been committed in trial, a harmless error analysis should be conducted pursuant to Rule 81(b)(2). In this case, it is my belief that a harmless error analysis would lead to a finding beyond a reasonable doubt that the complained of error did not contribute to appellant's punishment.

BAIRD, Judge, concurring and dissenting.

I disagree with the reasoning employed by the plurality to resolve appellant's first point of error and I dissent to the disposition of appellant's second point of error.

### I.

I disagree with the majority's treatment of appellant's first point of error regarding the admission of the psychiatric testimony at the punishment phase of appellant's trial.[1] The majority deems appellant's point of error as an attack on the use of psychiatric testimony in general and summarily dismisses the point. Maj. op. at 195. My reading of the point of error and supporting arguments leads me to the conclusion that the thrust of appellant's argument is against Dr. James Grigson, the psychiatrist who testified for the State. In reading this point, the plurality places its judicial stamp of approval on all future testimony by Dr. Grigson. Indeed, the plurality relying on several decisions by this Court, holds that objecting to Dr. Grigson's testimony is "futile." Maj. op. at 195, n. 1.

### A.

Dr. Grigson is a now famous psychiatrist frequently employed by the State to testify in the punishment phase of a capital mur-

1. Appellant's point of error number one provides:
   AN EXPERT OPINION OFFERED BY DR. GRIGSON IN RESPONSE TO A HYPOTHETI-

CAL QUESTION ON FUTURE DANGEROUSNESS VIOLATES DUE PROCESS OF LAW.

der trial that the defendant is a sociopath who shows a complete disregard for authority and the lives of other people. Dr. Grigson's usual opinion is "[t]hat most certainly an individual such as you described [in a hypothetical question based on defendant's criminal history and the evidence presented in that case] is going to be a threat to people in our society no matter where they are, whether in confinement or in the free world." *Amos v. State*, 819 S.W.2d 156, 162 (Tex.Cr.App.1991). Further, Dr. Grigson routinely testifies that he is "absolutely one hundred percent certain" of his predictions. *Cook v. State*, 821 S.W.2d 600, 602 (Tex.Cr.App.1991). *See also James v. State*, 772 S.W.2d 84, 89 (Tex.Cr.App.1989) (vacated on other grounds at 805 S.W.2d 415 (Tex.Cr.App. 1990)). Dr. Grigson's notoriety comes not only from his testimony but from his participation in the trials of *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) and *Barefoot v. Estelle*, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983).

These opinions have shaped the admissibility of psychiatric testimony presented in Texas capital murder trials. Based on my experience, no other witness has generated such controversy.[2]

### B.

The controversy continues in this case where appellant argues that "the time has come to re-examine Grigson jurisprudence in light of [appellant's] analysis. This Court has now seen enough cases to show that the usual methods of insuring fairness through cross-examination and the use of other experts simply does not work in the case of Dr. Death." [3] Appellant argues that Dr. Grigson appears as the disinterested expert while all the while being an advocate for the State.[4] "Donning the sheep's cloth of an unbiased 'expert,' Grigson testifies as an uninformed advocate for the State, with disturbingly effective results and remarkably carbon-copy performances on the stand." [5] Appellant further attacks

**2.** In *Belachheb v. State*, 699 S.W.2d 709, 711 (Tex.App.—Ft. Worth 1985) the defendant argued that Dr. Grigson's reputation is so poor and his bias so obvious that any trial judge who appointed him would be guilty of an abuse of discretion.

**3.** Appellant's Brief, page 4. In Dr. Grigson's own words:

"I have developed a way to testify that I end up having a tremendous amount of influence although, again, I think they've [the jury] already made up their mind prior to the time that I'm—get on the witness stand. But it makes them feel a whole lot easier whenever they're reassured that what they're doing is correct." Dr. James P. Grigson; C.B.S. News, West 57th, *Deadly Diagnosis: Trying Testimony*, October 15, 1988.

**4.** This case is presented in a somewhat unusual light because Dr. Grigson, at the time he testified in the instant case, was accompanied by reporter Ron Rosenbaum, a contributing author for Vanity Fair. Appellant included Rosenbaum's observations in much of his argument.

"I was watching her [a juror in a capital murder trial] and I could tell she didn't believe what the first [prosecution] psychiatrist told her, and she wasn't gonna hear what we had to say. So we took a coffee break after the first psychiatrist, and I told the prosecutor, 'you got trouble. You got one woman who's gonna hang up this jury, because she's not buying it.' ... We discovered she had a fourteen-year-old daughter. And I got back on the stand and had

the prosecutor ask me [about the defendant], 'Is this the kind of man that would rape and kill fourteen-year-old girls?'" Dr. James Grigson, *Travels With Dr. Death*, Vanity Fair; May 1990, 144.

"Midway on his hasty journey between death-penalty trials the Doctor is pumped up by his victory in Lamesa, [the instant case] primed for fresh battle this afternoon in Lubbock. 'By God, if it isn't war,' he tells me, 'I don't know what war is.'" Rosenbaum, Ron; *Travels with Dr. Death*, Vanity Fair, May 1990, 166.

"And as a bonus for the prosecutors who hire him, the Doctor also does his lethal best to destroy defense attorneys and defense witnesses who challenge him." Rosenbaum, Ron; *Travels With Dr. Death*, Vanity Fair; May 1990, 144.

"When Dr. Grigson appears in court, every aspect is planned carefully. Instead of a 'weird' psychiatrist, he comes across as a country doctor. ... Everything Dr. Grigson does on the stand is geared to making the jury believe him— which they usually do, judging by the verdicts." Jennings, Diane; Dallas Morning News, Section E-1, E-2, *James Grigson*, February 16, 1992.

"It's a personal type of satisfaction that makes me feel good. It's like the Boy Scouts—you did your good deed for the day." Jennings, Diane, *James Grigson*, Dallas Morning News, February 16, 1992, quoting Dr. James Grigson.

**5.** Appellant's brief, pg. 6. The following also illustrate the effectiveness of Dr. Grigson's "performances":

"A hundred fourteen times, he's testified for the death penalty. A hundred five times the

Dr. Grigson's integrity and requests that we exclude Dr. Grigson's testimony regarding future dangerousness from all future trials and reverse the instant case.[6]

## C.

The use of psychiatric testimony in the punishment phase of a capital murder trial was first addressed by the United States Supreme Court in *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). In *Smith*, Dr. Grigson was appointed to determine the competency of Smith to stand trial. Dr. Grigson examined Smith and concluded the defendant was competent. During the punishment phase of the trial, the State called Dr. Grigson to testify with respect to the "future dangerousness" of Smith.[7] The Supreme Court held that Dr. Grigson's testimony, based upon the pretrial competency examination, violated the Fifth and Sixth Amendments to the United States Constitution. However, the Supreme Court expressly held psychiatric testimony to be admissible. *Estelle v. Smith*, 451 U.S. at 473, 101 S.Ct. at 1878.

Dr. Grigson's testimony, in the context of a hypothetical question, was reviewed by the United States Supreme Court in *Barefoot v. Estelle*, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983). The Court reviewed the following questions: Whether psychiatrists, individually and as a group, are incompetent to predict with an acceptable degree of reliability that a particular criminal will commit other crimes in the future and so represent a danger to the community; and, whether psychiatrists may testify about future dangerousness in response to a hypothetical question without the benefit of an examination of the individual. *Barefoot v. Estelle*, 463 U.S. at 896, 103 S.Ct. at 3396. The Court held that psychiatric testimony, through the use of a hypothetical question, is permissible. The Court reasoned that the reliability of such testimony is tested through cross-examination and that using a hypothetical question to examine an expert witness is common.

If they [expert psychiatric witnesses] are so obviously wrong and should be discredited, there should be no insuperable problem in doing so by calling members of the [American Psychiatric] Association who are of that view and who confidently assert that opinion in amicus brief. Neither petitioner nor the Association suggests that psychiatrists are always wrong with respect to future dangerous-

---

jury agreed with him." C.B.S. News, West 57th Street; *Deadly Diagnosis: Trying Testimony,* October 15, 1988.

"Grigson's confident predictions and repeated use of the term 'sociopath' have helped send more than 100 prisoners to Death Row...." A.B.C. News, 20/20, *Dr. Death;* November 25, 1988.

6. Following is a description of Dr. Grigson's testimony in the instant case:

For a brief moment there in Lamesa, it looked as if [appellant's attorney] might have some momentum going into his assault on the Doctor. But then [appellant's attorney] made a fatal mistake. He fell into a Doctor death trap, one of the patented devastating counterpunches that have earned the Doctor a reputation as a killing machine on cross examination. Many lawyers told me the best thing to do is not to cross the Doctor at *all,* to minimize the damage he can do.

... But [appellant's attorney] had done a lot of homework he didn't want to go to waste. He began ... a bit smugly, 'In the case of *Rodriguez v. Texas,* 1978, [did you say of Rodriguez?], No matter where he is he will kill again'? ... Do you remember that?

Now, this might have been a good question because it was clear the Doctor couldn't recall who the hell Rodriguez was. But the Doctor—a poker player as well as a chess player— shrewdly calculated that [appellant's attorney] didn't know the details either. And so he felt free to spring a trap of his own.

The Doctor replied as if searching his memory and then coming upon a grim recollection. 'Is Rodriguez the one that killed four women and raped thirty-eight?'

Of course, he had no idea what Rodriguez had done. But what the jury heard was: killed four, raped thirty-eight.

7. "Dr. James P. Grigson, a practicing psychiatrist appointed by the court to examine appellant, testified that his examination had led him to conclude that the appellant, though medically and legally sane, felt no remorse or sense of guilt as the result of his participation in this robbery-murder. Grigson also expressed the opinion that appellant's conduct in the future would not change. He further stated that his branch of medical science had found no cure for persons who were suffering from the type of personality disorder demonstrated by appellant." *Smith v. State,* 540 S.W.2d 693, 696 (Tex. Cr.App.1976).

ness, only most of the time. Yet the submission is that this category of testimony should be excised entirely from all trials. We are unconvinced, however at least as of now, that the adversary process cannot be trusted to sort out the reliable from the unreliable evidence and opinion about future dangerousness, particularly when the convicted felon has the opportunity to present his own side of the case.

*Barefoot v. Estelle,* 463 U.S. at 900–901, 103 S.Ct. at 3396. The Court found no reason for the general rule governing hypothetical questions to change when psychiatric evidence is offered. *Barefoot v. Estelle,* 463 U.S. at 903–904, 103 S.Ct. at 3400. Since the Supreme Court's decisions in *Smith* and *Barefoot,* Dr. Grigson has testified in the punishment phase of many capital murder trials.[8]

An individual may testify as an "expert" in Texas if the requirements set forth in the Texas Rules of Criminal Evidence are met. The expert must have some scientific, technical, or specialized knowledge which will assist the trier of fact to determine an issue. Tex.R.Crim.Evid. 702. The facts or data upon which the expert bases his opinion, if such are commonly relied upon by experts in his field, need not be restricted to those which are admissible in evidence. Tex.R.Crim.Evid. 703. Upon request, the expert witness may be required to submit to examination out of the presence of the fact finder. If the trial judge determines that the witness does not have a sufficient basis for such opinion, the witness' opinion shall be inadmissable until such a time as a sufficient basis for such opinion is shown. Tex.R.Crim.Evid. 705(a), (b), & (c).

### D.

Appellant argues that we should "outlaw" the testimony of Dr. Grigson in all

future capital murder cases. However, appellant fails to provide the Court with a legal basis for excluding the testimony. The testimony of an "expert" witness is not *per se* inadmissible because his opinion, integrity, or theories are questioned by his colleagues or members of the bar. Though I would not personally vouch for Dr. Grigson's testimony, the only legal basis by which such testimony may be excluded *per se,* would be to reverse the decision of the United States Supreme Court in *Barefoot.* Such action is not within the powers of this Court.

Although Dr. Grigson's testimony is not incompetent *per se,* his testimony should not receive our judicial stamp of approval. With every witness, including the famous and infamous, the State has the burden of satisfying the requirements set forth in the Texas Rules of Criminal Evidence. If the rules are not satisfied in any particular case, the familiarity of this Court with a particular witness does not matter. Dr. Grigson is not immune from our Rules; his opinions are subject to the same scrutiny as any other expert. Therefore, the trial judge is required to independently determine the admissibility of Dr. Grigson's testimony in each case. If Dr. Grigson does not have a sufficient basis for his opinion, his opinion is inadmissible. Tex.R.Crim. Evid. 705(c).

However, review is not required in this case because appellant did not object to Dr. Grigson's qualifications or the basis of Dr. Grigson's opinion. Appellant's only objection was "to any testimony, as not being recognized within the field in which he [Dr. Grigson] practices." This issue has been resolved against appellant. *See Barefoot v. Estelle,* 103 S.Ct. at 3396–3397; *and Nethery v. State,* 692 S.W.2d 686, 709 (Tex. Cr.App.1985). Therefore, I concur in the resolution of appellant's first point of error.

---

**8.** *See Cook v. State,* 821 S.W.2d 600, 602 (Tex.Cr. App.1991) (opinion on rehearing); *Amos v. State,* 819 S.W.2d 156, 162 (Tex.Cr.App.1991); *Hartley v. State,* 790 S.W.2d 332, 333 (Tex.Cr. App.1990); *Stoker v. State,* 788 S.W.2d 1, 8 (Tex. Cr.App.1989); *James v. State,* 772 S.W.2d 84, 89 (Tex.Cr.App.1989); *Rogers v. State,* 774 S.W.2d

247, 262 (Tex.Cr.App.1989); *Holland v. State,* 761 S.W.2d 307, 319 (Tex.Cr.App.1988); *Cook v. State,* 741 S.W.2d 928, 945 (Tex.Cr.App.1987); *Hogue v. State,* 711 S.W.2d 9, 29 (Tex.Cr.App. 1986); *and, Nethery v. State,* 692 S.W.2d 686, 708 (Tex.Cr.App.1985).

## II.

I dissent to the disposition of appellant's second point of error. I believe the plain wording of Tex.R.Crim.Evid. 104(b) places upon the trial judge the ultimate burden of determining the relevancy of evidence which is offered subject to the fulfillment of a condition of fact. In other words, contrary to the plurality's assertion, the trial judge has the duty to notice whether the evidence is eventually "connected up" because the judge, not the defendant, availed himself of the procedures in Rule 104(b). To that extent I agree with Judge Miller. See page 211 (Miller, J., concurring).

Additionally, it should be noted that the plurality has premised the disposition of appellant's second point of error on an argument neither raised nor argued by the State. The State does not contend that appellant failed to preserve the error for appellate review.[9] Rather, the State addresses the merits of appellant's point of error.

The procedural bar argument advanced by the plurality is not properly before this Court. In *Tallant v. State*, 742 S.W.2d 292, 294 (Tex.Cr.App.1987) we held:

Transgressions of rules of appellate procedure which this Court has insisted to be followed cannot be summarily dismissed. ... Just as an appellant must properly present points of error to the court of appeals for its decision in order to complain of an adverse determination by way of ground of review, *we hold that the State must call to the attention of the court of appeals in orderly and timely fashion that an alleged error was not preserved.*[10]

See also, *Leal v. State*, 773 S.W.2d 296, 297 (Tex.Cr.App.1989). However, the plurality invents the procedural bar which requires that "the objecting party must re-urge his relevancy complaint after all the proof is in, ask the offending evidence be stricken, and request that the jury be instructed to disregard it." Maj. op. at 198. This procedural bar is contrary to the plain wording of Tex.R.Crim.Evid. 103(a)(1):

Objection. In case the ruling is one admitting evidence, a timely objection *or* motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; ...

However, the plurality requires that appellant not only object, *but to re-urge his objection and make a motion to strike.* The plurality then utilizes its invention to forfeit appellant's right of appellate review and in so doing, places yet another unnecessary burden upon the defendant. *See Goss v. State*, 826 S.W.2d 162, 171 (Tex.Cr. App.1992) (Baird, J., dissenting). The plurality by becoming both advocate and judge has lost any appearance of impartiality.

The plurality agrees that the evidence concerning the Aryan Brotherhood is irrelevant.[11] Accordingly, the evidence was inadmissible under Tex.Code Crim.Proc.Ann. art. 37.071[12] and it should not have been admitted.[13] Believing that appellant's timely objections preserved this point for

---

9. The State in this case is represented not only by the elected District Attorney of Dawson County, but also the Attorney General's Office of the State of Texas.

10. Unless otherwise indicated, all emphasis herein is supplied by the author.

11. "Because this testimony was legally inadequate to connect Appellant with the Aryan Brotherhood in any meaningful way, proof in the abstract of that organization's beliefs and activities was ultimately irrelevant to any issue at the punishment phase of his trial." Maj. op. at 198.

12. Tex.Code Crim.Proc.Ann. art. 37.071 provides in part:
   ... In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence, ...

13. Having found the evidence inadmissible, there is no need to address appellant's contention that admission of the evidence was violative of the First Amendment to the United States Constitution.

appellate review and further finding that the evidence was irrelevant, I would proceed to conduct a harm analysis pursuant to Tex.R.App.P. 81(b)(2).

I cannot say, beyond a reasonable doubt, that this evidence did not contribute to the sentence imposed. The evidence established the Aryan Brotherhood as a neonazi, white supremist, racist gang which had a high propensity for violence. The gang worked to control the other members of the prison population through intimidation and fear. In gaining this control the gang committed murder for remuneration, murder and aggravated assaults. The evidence was offered to persuade the jury to affirmatively answer the second special issue by convincing the jury that appellant would commit criminal acts of violence that would constitute a continuing threat to society, which includes prison society. *See, Boyd v. State*, 811 S.W.2d 105, 188 n. 12 (Tex.Crim.App.1991). The jury made such an affirmative finding. Accordingly, I cannot conclude the admission of the evidence was harmless beyond a reasonable doubt and, therefore, I dissent.