Death Opinion



 












IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO.74,341






GERONIMO GUTIERREZ, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM BEXAR COUNTY






 Johnson, J., delivered the opinion of the Court in which Keller, P.J. and
Price, Womack, Keasler, Hervey, Holcomb, and Cochran, JJ., joined. Meyers, J.,
concurs in point of error number 7 and otherwise joins the opinion of the Court.



O P I N I O N



 On April 12, 2002, a jury convicted appellant of capital murder. Tex. Penal Code Ann. §
19.03(a). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal
Procedure Article 37.071, §§ 2(b) and 2(e), the trial judge sentenced appellant to death. Art. 37.071 §
2(g). (1) Direct appeal to this Court is automatic. Art. 37.071 § 2(h). Appellant raises nine points of error. 
We affirm.

STATEMENT OF FACTS


 Appellant was indicted for the May 29, 1999, murder of Rick Marin during the course of
committing or attempting to commit robbery. Marin, a resident of San Antonio, was reported missing on
May 30, 1999. His charred Ford Mustang was found on May 31, 1999, with the engine, transmission,
tail lights, and radio missing. Marin's badly burned and decomposed body was found in another area of
town on June 4, 1999. The cause of death was determined to be shotgun blasts.

SUFFICIENCY OF THE EVIDENCE

 In his eighth point of error, appellant asserts that the evidence is legally insufficient to support the
jury's verdict that he murdered Marin in the course of robbery or attempted robbery. Appellant does not
dispute that the evidence is sufficient to show that he murdered Marin, but argues that there is no evidence
to show he did so with the intent to commit robbery. In reviewing the legal sufficiency of the evidence, this
Court looks at all of the evidence in the light most favorable to the verdict to determine whether any rational
trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson v.
Virginia, 443 U.S. 307 (1979).

 Manuel Torres, a life-long friend of appellant, testified that his neighbor, Ramon Martinez, had a
Mercury Cougar in his back yard and that it did not have an engine. In the late spring of 1999, Martinez
mentioned to Torres that he was interested in obtaining one. Torres told Martinez that he knew someone
who could help him find one and contacted appellant. Appellant then met with Torres and Martinez at
Martinez's house and told Martinez he could get an engine for him if he was willing to pay for it. 
Approximately two weeks later, Torres witnessed appellant arriving at Martinez's house with a car engine
and assorted car parts. He helped appellant unload the engine and parts. On direct examination, Torres
stated that he asked where appellant got the engine and appellant replied that he had seen a Ford Mustang
on the south side of the city, stolen it, stripped some of the parts, and removed the engine. He then
abandoned the car and burned it. However, on cross-examination, Torres stated that appellant had not
admitted to stealing the car or burning it. On re-direct examination, after he was confronted with his
statement to police and after the prosecutor warned him that one could get into trouble for lying under oath,
Torres reluctantly conceded that appellant had, in fact, told Torres that he had stolen the car and burned
it.

 Martinez testified that, at the suggestion of Torres, he met with appellant in April or May of 1999
to discuss the possibility of appellant obtaining an engine for Martinez's Mercury Cougar. Appellant told
Martinez that he could get a Ford Mustang 5.0-liter engine for $800. Martinez agreed to the price. A few
days later, appellant went to Martinez's house after work, and the two discussed guns. Appellant learned
that Martinez owned a 12-gauge shotgun. Appellant mentioned an upcoming gun show, and the two made
plans to attend. After attending the gun show, Martinez purchased a .22-caliber rifle and accompanied
appellant to a ranch owned by appellant's mother to shoot the gun. A few weeks later, appellant
approached Martinez and asked to borrow his shotgun. When Martinez refused, appellant asked to
borrow $100 so that he could retrieve his shotgun from a pawn shop. Martinez loaned appellant the
money, but maintained he did not know what appellant planned to do with the shotgun. About a month
later, appellant appeared at Martinez's workplace. He was driving a pick-up truck with a Ford Mustang
5.0-liter engine in the bed. Appellant delivered the engine to Martinez's house, and Martinez paid appellant
for it in cash. Martinez testified that, at a later date, appellant came to Martinez's home with a newspaper
article that reported the discovery of Marin's charred Ford Mustang and the search for Marin. Appellant
showed Martinez the article and said, "That's the guy I shot for the car." Appellant then told Martinez that
he had taken the car to "his lot" (2) and had set it on fire. In January of 2001, police went to Martinez's
workplace, arrested him for receiving stolen property, and took him to the police station, where he gave
a voluntary statement. Family members informed him that, while he had been at the police station, a search
warrant had been executed at his house. During his questioning, Martinez told police where his guns were
and gave his consent for police to retrieve them. Tests on the weapons revealed that they had not been
used in the murder in this case. The charges against Martinez for receiving stolen property were later
dropped. Martinez acknowledged on the stand that he should have come forward and told police what
he knew about Marin's death but was afraid to get involved.

 Anthony Rodriguez testified that he had met appellant in 1998 while incarcerated in the Bexar
County Jail and that the two had become friends. In May of 1999, appellant went to Rodriguez's
apartment and asked whether Rodriguez wanted to earn some money. Rodriguez said that he did and
accompanied appellant to Martinez's house. While there, Martinez asked appellant whether he could
obtain a Ford Mustang 5.0-liter engine. Appellant replied that he could and that the cost would be $1,000. 
A few weeks later, appellant told Rodriguez that he had seen a Ford Mustang with a 5.0-liter engine in the
parking lot of Rodriguez's apartment complex and said that he wanted to steal it. His plan was to pull the
owner of the car into Rodriguez's apartment, shoot her, and steal the car. Rodriguez testified that he was
shocked by this idea and refused to go along with appellant's plan. The next day, Rodriguez went with
appellant to Martinez's house. Appellant said that he was going there to borrow money from Martinez to
get his shotgun out of a pawn shop. Appellant and Rodriguez then went to the Westside Pawn Shop,
where appellant paid what he owed to retrieve his shotgun and filled out some paperwork. The clerk told
appellant it would be three working days before he could pick up the shotgun because of federal
regulations. The day before Marin's murder, appellant told Rodriguez he had a new idea about how to
steal a Ford Mustang. He said that he planned to flag down a Ford Mustang near Palo Alto College, shoot
the driver, put the driver in the back seat, and drive away with the car. Rodriguez testified appellant said,
"I'm going to fucking shoot him, and I'm not giving the guy a chance." Rodriguez said he wanted nothing
to do with the plan and ignored appellant's phone calls the following day. A few days later, appellant went
to Rodriguez's apartment and asked Rodriguez if he wanted to "hang out." Rodriguez said he did, and the
two went to Martinez's house. While there, appellant showed Rodriguez the 5.0-liter engine and said,
"Remember what we were supposed to do Saturday? I did it. I got the motor." After leaving Martinez's
house, appellant and Rodriguez went to the home of appellant's girlfriend. The two watched the ten-o'clock news with appellant's girlfriend. One of the stories on the news was about Marin's disappearance. 
Rodriguez testified that, after seeing the news story, appellant became "shaky" and told Rodriguez, "That
shit we were watching right now, I - I did it."

 The testimony of Torres, Martinez, and Rodriguez, detailing appellant's own statements regarding
his intent to steal Marin's car, is sufficient evidence for a jury to find appellant intended to rob Marin of his
vehicle. Appellant's eighth point of error is overruled.

 In appellant's ninth point of error, he alleges that the evidence is factually insufficient to support the
jury's verdict of guilt. In a factual-sufficiency review, the appellate court views all the evidence without the
prism of "in the light most favorable to the prosecution" and, as we recently said in Zuniga v. State, __
S.W.3d__, ___, No. 539-02 (Tex. Crim. App., delivered April __, 2004, slip op. at __), will set the
verdict aside only if the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the
contrary evidence is so strong that the standard of proof beyond a reasonable doubt could not have been
met. Id. A verdict is clearly wrong and unjust if the jury's finding is "manifestly unjust," "shocks the
conscience," or "clearly demonstrates bias." Santellan v. State, 939 S.W.2d 155, 164 (Tex. Crim. App.
1997).

 Appellant points out that there were no witnesses to the robbery or murder, and that the
complainant's burned, decomposed body was found in one area of town on June 4, while the complainant's
burned car was found in another area of town on May 31. He suggests that, since the body was found in
one part of town several days after the stolen car was found in another part of town, there is no proof the
murder was committed with the intent to obtain control of the car. Nevertheless, appellant offered no
evidence to refute the state's contention that he murdered Marin in the course of committing or attempting
to commit robbery. Thus, the same facts that make the evidence legally sufficient also make it factually
sufficient. The evidence supporting the verdict was not so weak as to be clearly wrong and manifestly
unjust, nor was the contrary evidence so strong that the standard of proof, beyond a reasonable doubt,
could not have been met. See Zuniga, __ S.W.3d at __, slip op. at ___. Appellant's ninth point of error
is overruled.

COMMENT ON FAILURE TO TESTIFY


 In his first point of error, appellant claims that the trial court erred by overruling his objection to the
prosecutor's comment on appellant's failure to testify. The prosecutor made the following argument at the
guilt or innocence phase of trial:

 You don't excuse somebody's behavior who's capable of doing this type of things [sic],
just because we don't have an eyewitness at the moment the crime occurred. Criminals
commit crimes in instances and circumstances where they think they're not going to get
caught. But you know what? He messed up. He left too many trails. Too many pieces
of evidence to link him to this crime, and he can't get out of it. And what he's trying to do
today is what he tried to do for the seventeen months he escaped law enforcement. He's
hiding from the truth. And you don't reward him for that.

 A prosecutor may not comment on the failure of an accused to testify. Such comment violates the
privilege under the Fifth Amendment of the United States Constitution and Article I, § 10, of the Texas
Constitution against self-incrimination and the freedom from being compelled to testify against oneself. 
Griffin v. California, 380 U.S. 609 (1965); Bustamante v. State, 48 S.W.3d 761, 764 (Tex. Crim.
App. 2001). "To violate the right against self-incrimination, the offending language must be viewed from
the jury's standpoint and the implication that the comment referred to the defendant's failure to testify must
be clear." Bustamante, 48 S.W.3d at 765. For reversal to be warranted, the language used must have
been manifestly intended or was of such a character that the jury would necessarily and naturally take it as
a comment on the defendant's failure to testify. Id.

 The prosecutor's argument here was not a direct comment on appellant's failure to testify, nor
would the jury necessarily take it as such. The evidence at trial showed that appellant took great pains to
cover up his crime by dumping and burning the victim's body in one location and dumping and burning the
victim's car in another. He remained free for seventeen months after the murder. The jury could have
logically concluded that the prosecutor's comment referred to the actions appellant took to elude
authorities. At most, the prosecutor's reference to hiding from the truth "today" was an implication or an
allusion to appellant's failure to testify. Even so, it does not rise to the level of reversible error. Cannon
v. State, 691 S.W.2d 664, 677 (Tex. Crim. App. 1985), cert. denied, 474 U.S. 1110 (1986) (indirect
allusion that might refer to appellant's failure to testify does not require reversal). Appellant's first point of
error is overruled.


ACCOMPLICE-WITNESS INSTRUCTION


 In his second and third points of error, appellant argues that the trial court erred in failing to submit
to the jury an instruction on whether Ramon Martinez and Anthony Rodriguez were accomplice witnesses. 

 An accomplice is one who, before, during, or after its commission, participates in an offense to the
extent that he can be charged with the offense or a lesser-included offense. Blake v. State, 971 S.W.2d
451, 454-455 (Tex. Crim. App. 1998). In other words, an accomplice is a legally culpable participant in
an offense. Id. Mere presence at the commission of an offense, knowledge of its commission, failure to
disclose it, or even concealing it, does not make one an accomplice. Id. An affirmative act intended to
promote the offense is required. Kutzner v. State, 994 S.W.2d 180, 188 (Tex. Crim. App. 1999). 
Complicity with an accused in the commission of a separate offense does not make a witness an accomplice
in the offense for which the accused is on trial. Id.

 As detailed in the previous points of error, neither Martinez nor Rodriguez acted to promote the
commission of the capital murder in this case. Rodriguez knew that appellant might commit an offense, but
did not assist him in any way and is, therefore, not an accomplice. Although both Martinez and Rodriguez
knew of the crime after its commission, this does not make them accomplices. The trial court correctly
denied appellant's request to include accomplice-witness instructions in the jury charge. Appellant's
second and third points of error are overruled.

IMPROPER IMPEACHMENT


 In his fourth point of error, appellant asserts that the trial court erred by allowing the state to
impeach Torres with his statement to police as a prior inconsistent statement, in violation of Rule of
Evidence 613. Specifically, he argues that, when the state showed Torres his statement to refresh his
memory, the state was actually trying to admit Torres's entire statement into evidence. He contends that
the state's actions were improper because the state was attempting to present otherwise inadmissible
evidence that appellant shot the victim. He argues that the trial court erred by allowing the statement into
evidence because it allowed the state to get that information in front of the jury "through the back door." 
 Appellant's argument is without merit; Torres's statement was never offered nor admitted into evidence
at trial. Appellant's fourth point of error is overruled.

ADMISSIBILITY OF PHOTOGRAPHS


 In his fifth point of error, appellant asserts that the trial court erred in overruling his objections to
the admissibility of fourteen autopsy photographs. Specifically, he claims that the probative value of the
photographs was substantially outweighed by unfair prejudice, in violation of Rule of Evidence 403.

 The admissibility of photographs is governed by Rule 403 of the Texas Rules of Evidence which
states:

 Although relevant, evidence may be excluded if its probative value is substantially
outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the
jury, or by considerations of undue delay, or needless presentation of cumulative evidence.


See Long v. State, 823 S.W.2d 259, 271-72 (Tex. Crim. App. 1991), cert. denied, 505 U.S. 1224
(1992). Rule 403 favors the admission of relevant evidence and carries a presumption that relevant
evidence will be more probative than prejudicial. Montgomery v. State, 810 S.W.2d 372, 389 (Tex.
Crim. App. 1990); see also Jones v. State, 944 S.W.2d 642, 651-52 (Tex. Crim. App. 1996), cert.
denied, 522 U.S. 832 (1997); Long, 823 S.W.2d at 271. The trial court's decision will not be disturbed
on appeal unless it falls outside the zone of reasonable disagreement. Jones, 944 S.W.2d at 651-52;
Montgomery, 810 S.W.2d at 391.

 A court may consider many factors in determining whether the probative value of photographs is
substantially outweighed by the danger of unfair prejudice. These factors include: the number of exhibits
offered, their gruesomeness, their detail, their size, whether they are in color or black and white, whether
they are close-up, and whether the body depicted is clothed or naked. Jones, 944 S.W.2d at 651-52. 
A court, however, should not be limited by this list. The availability of other means of proof and the
circumstances unique to each individual case should also be considered. Id.

 Appellant unsuccessfully objected to the admission of state's Exhibits 99, 100, 101,109, 110, 114,
115, 116, 117, 120, 121, 122, 123, 124, and 149. The state withdrew its proffer of Exhibit 101, and it
was not admitted into evidence. All of the photographs are 8" by 10" in size and are in color. Exhibit 99
depicts Marin's charred body as it was when it was brought into the medical examiner's office from the
crime scene. Exhibit 100 shows a closer view of Marin's back, which showed maggot infestation. Exhibit
109 is a photograph of Marin's upper back and the back of his skull. Exhibit 110 is a photograph of
Marin's body from his skull to his knees. Exhibit 114 depicts Marin's thighs and shows the absence of his
legs from the knees down. Exhibit 115 depicts Marin's lower torso to his knees. Exhibit 116 is a
photograph of the victim's torso. Exhibit 117 is a photograph depicting Marin's feet, which were detached
from the rest of his body. Exhibits 120, 121, 122, 123, and 124 are photographs of different bone
fragments. Exhibit 149 depicts two x-rays showing the location of the shotgun pellets in Marin's body.

 The photos are relevant because they accurately reflect the state of Marin's body when it was
discovered and the injuries inflicted upon him. None of the photographs are especially large, and all were
taken from different angles. Although most of the photographs depict maggot infestation, we will not
consider them overly gruesome simply because they show the body in a state of decomposition. Madden
v. State, 799 S.W.2d 683, 696-97 (Tex. Crim. App. 1990), cert. denied, 499 U.S. 954 (1991)(citing
Knoppa v. State, 505 S.W.2d 802 (Tex. Crim. App. 1974)(holding photographs admissible despite the
presence of decomposition and maggots)). The photographs were relevant, and their probative value was
not substantially outweighed by any unfair prejudice. Thus, the trial court did not err in overruling
appellant's objections to their admissibility. Appellant's fifth point of error is overruled.

EVIDENCE OF GANG AFFILIATION In his sixth point of error, appellant claims that the trial court erred by admitting, at the punishment
phase of trial, evidence regarding appellant's gang affiliation. He contends that the evidence was not
relevant and its admission violated his First Amendment right to free association.

 With respect to relevancy, evidence of gang membership is relevant at the punishment phase of trial
to show future dangerousness. Mason v. State, 905 S.W.2d 570, 577 (Tex. Crim. App. 1995), cert.
denied, 516 U.S. 1051 (1996). To be admissible, the state must prove that a specific gang engages in
violent or illegal activities and that the defendant is a member of that gang. Id. Likewise, regarding the right
to free association, the state is not precluded from introducing evidence of a defendant's gang membership
as long as it shows that the gang in question is prone to violent activities. Fuller v. State, 829 S.W.2d 191,
196 (Tex. Crim. App. 1992), cert. denied, 508 U.S. 941 (1993). The reasoning is that, because
organizational activities with illegal aims are not protected by the First Amendment, neither is membership
in such organizations. Id.

 Deputy Jimmy Pearson testified that he was employed in the classification department of the Bexar
County Jail and that he met with appellant at the jail in September of 1995. The purpose of the meeting
was to determine the best placement for appellant in the jail. Pearson testified that it was important to
separate rival gang members in the jail to eliminate possible violence between warring gang members. To
that end, appellant signed an "acknowledgment of gang affiliation" and admitted his membership in the "Big
Time Kings." He told Pearson that his street name was "Redrum" and listed his gang enemies as "The
Raiders, L.A. Boyz, Ambrose, Cribbs, Crips, 'Tepa,' and Bad Company."

 Detective Rocky Dyer testified that he had been a San Antonio police officer for fifteen years, that
during most of that time he had been assigned to gang units and that, between 1989 and the trial, he had
completed over 300 hours of advanced gang-investigator study. He further testified that he was President
of the Texas Gang Investigators Association, taught courses in gang investigation to other officers, and was
very familiar with the gangs in San Antonio. He testified that the Big Time Kings are the largest street gang
in San Antonio and were involved in "just about everything you could imagine. All the way from petty
thefts, all the way up to capital murder, robberies, burglaries, drive-by shootings, aggravated assaults." He
went on to say that enemies of the Big Time Kings included LA Boys, Bad Company, and Ambrose,
among others.

 The state established that appellant is a member of a gang and that the gang to which he belongs
engages in violent and illegal activities. Therefore, evidence of appellant's gang membership was relevant
to a special issue. The admission of this evidence did not violate his right to free association. Fuller, supra. 
The trial court did not err in admitting evidence of gang affiliation. Appellant's sixth point of error is
overruled.


VICTIM-IMPACT EVIDENCE


 In his seventh point of error, appellant argues that the trial court erred by admitting victim-impact
evidence at the punishment phase of trial, in violation of Rule of Evidence 403. Specifically, he claims that
the state improperly engaged in a comparison of worth between appellant and Marin and that the sheer
volume of the evidence was more prejudicial than probative.

 Victim-impact and character evidence is admissible to show the uniqueness of the victim, the harm
caused by the defendant, and as rebuttal to the defendant's mitigating evidence. Mosley v. State, 983
S.W.2d 249, 262 (Tex. Crim. App. 1998), cert. denied, 526 U.S. 1070 (1999). Rule 403 limits the
admissibility of this evidence when the evidence encourages comparisons based upon the greater or lesser
worth or morality of the victim. Id. When the focus of the evidence shifts from humanizing the victim and
illustrating the harm caused by the defendant to measuring the worth of the victim compared to other
members of society, the state exceeds the bounds of permissible testimony. Id. Considerations in
determining whether testimony should be excluded under Rule 403 include the nature of the testimony, the
relationship between the witness and the victim, the amount of testimony to be introduced, and the
availability of other testimony relating to victim impact and character. Id. Mitigating evidence introduced
by the defendant may also be considered in evaluating whether the state may subsequently offer victim-related testimony. Id.

 The state called several members of Marin's immediate family to testify: his brother, Steven, his
sister, Michelle, his father, Raul, and his mother, Vicci. Appellant did not object during any portion of the
testimony of Steven or Michelle. Thus, he has forfeited his right to appeal as to these witnesses. Tex. R.
App. P. 33.1.

 Raul testified about his own personal background, including that he is a veteran of the Vietnam
War. After his service in the Vietnam War, he married Vicci and had three children. Although Raul and
Vicci divorced, Raul remained very close to his children. When Marin turned sixteen years old, Raul
bought him the 5.0-liter Mustang that appellant stole. Marin spent a good deal of time at Raul's house, and
Raul helped Marin upgrade parts of the car, such as the stereo system and engine. On May 30, 1999, Raul
was preparing to celebrate his birthday with a few friends when Steven called and told him that Marin was
missing. Raul and Steven set out to look for Marin while Michelle called area hospitals. The next day,
while Raul and Steven were again out looking for Marin, a San Antonio police detective called Steven's
cell phone and told him that Marin's car had been found. The Heidi Search Center then became involved
in the search for Marin, and Raul and Steven joined in their efforts. Five days later, police notified Raul
that they had found Marin's body. Raul was devastated. Raul testified that, as a result of his son's death,
he has been unable to celebrate his birthday, his daughter's birthday, (3) or Christmas, and that there is a
permanent void in his life. He described his son's death as senseless.

 Vicci testified that her son was a gentle, kind, and giving son who, at the time of his death, lived with
her. Vicci worked for the San Antonio Independent School District assisting in the special education
department with physically disabled children. Vicci related that Marin donated time and money to help
these children. On the day of his death, Marin dropped Vicci off at her weekend job at a group home for
mentally retarded adults. The next day, Michelle phoned Vicci at work to let her know that Marin had not
returned home after going out Saturday night. Both agreed this was not like Marin and began phoning his
friends to see if anyone had heard from him. The next day, Michelle contacted the Heidi Search Center. 
Five days later, Vicci was notified that Marin's body had been found. At this point during her testimony,
Vicci became upset, and the trial court recessed for ten minutes. When she resumed testifying, Vicci said
that, after her son's death, she quit both of her jobs because she was so emotionally distraught. She visited
Marin's grave every other day. She was especially sad that she would never have grandchildren from her
first-born son and that Marin would never know any grandchildren she might have from his siblings. (4)

 Nothing in the record suggests that the state engaged in a comparison of the worth of appellant and
Marin. The testimony came from immediate family members who related the uniqueness of Marin's
character and the impact of his death on his family. Further, neither the tenor nor the volume of the
evidence is such that it is unfairly prejudicial, nor would any prejudice resulting from the evidence
substantially outweigh its probative value. Appellant's seventh point of error is overruled.

 We affirm the judgment of the trial court.

 Johnson, J.

En banc

Delivered: April 21, 2004

Do Not Publish
1. Unless otherwise indicated, all references to articles refer to the Texas Code of Criminal Procedure.
2. Presumably, this refers to the vacant lot where Marin's charred vehicle was found.
3. Raul's daughter's birthday is May 28, one day before Marin's death occurred.
4. Marin's sister, Michelle, was pregnant at the time of trial.